**UNITED STATES of America, Petitioner–Appellee,**

v.

**Ronald P. MARKWOOD, Respondent–Appellant.**

No. 93–2059.

United States Court of Appeals, Sixth Circuit.

Argued Sept. 19, 1994.

Decided March 17, 1995.

970

Michael F. Hertz, Jr., U.S. Dept. of Justice, Civ. Div., Steve Maddox, Dennis L. Phillips, U.S. Dept. of Justice, Civ. Division—Comm. Litigation Branch, Mark B. Stern (argued and briefed), U.S. Dept. of Justice, Civ. Div., Dennis L. Phillips, U.S. Dept. of Justice, Civ. Division—Comm. Litigation Branch, Washington, DC, for petitioner-appellee.

Nancy Luque (argued and briefed), Dombroff & Gilmore, Washington, DC, for respondent-appellant.

Before: BROWN, MARTIN, and BOGGS, Circuit Judges.

BOYCE F. MARTIN, Jr., Circuit Judge.

The dispute that gives rise to this appeal involves a disagreement over whether or not Arveco, Inc. included the requisite amount of federal excise tax when it bid on a billion dollar contract to supply the Army with trucks. We are charged with determining under the arcanum of federal procurement and false claims laws whether an administrative subpoena was properly issued to begin an investigation of a possible false claim. Agreeing with the district court that it was properly issued, we **AFFIRM.**

On May 1, 1985, a division of the United States Department of Defense, the Tank Automotive Command of the United States Army, issued a two-step invitation for bids to supply the Army with 15,218 five-ton trucks. The bid was to cover delivery over five years with an option to supply an additional 15,218 trucks of the same size. The party offering its bid to the Tank Command is not clearly identified in the materials submitted to this Court, and most of the bid solicitation documents are illegible. The offering party appears to be Arveco, Inc., a joint venture with Harsco, Incorporated and one of Harsco's unincorporated subsidiaries, BMY Wheeled Vehicles Division, and General Automotive Corporation, Inc., all of which we will refer to as Arveco.[1] Ronald Markwood, the now named party to this appeal, was President of Arveco on the date it submitted its bid and, as of February 9, 1988, Markwood was Vice President and General Manager of its BMY Wheeled Vehicles Division. Markwood was directly in charge of preparing and submitting the bids on the trucks, and signed the bid offer as President of Arveco.

The bids to provide the Army with trucks were opened on April 14, 1986, and the bids for the trucks were to include an amount for federal excise tax.[2] In a departure from common sense, Congress has decreed that manufacturers of certain vehicles weighing over 33,000 pounds must pay a federal excise tax for road maintenance even though the United States is the purchaser. 26 U.S.C. § 4051(a)(1). In any event, whether the federal excise tax clause (paragraph B.0.1.1) in the government's bid solicitation document required bidders to include federal excise tax for trucks delivered during the entire term of the contract, or only for trucks delivered prior to October 1, 1988 (the scheduled expiration date for the tax), was a subject of dispute between Arveco and the Tank Command just prior to the due date for the submission of bids.

On the morning bids were to be submitted, April 14, 1986, Arveco asked the purchasing officer for the United States if it should include the excise tax on trucks to be delivered after October 1, 1988, because the statute extending the excise tax was due to expire on that date. However, the statute had been regularly extended since its enactment in 1917. Anticipating the extension of the tax, the purchasing officer apparently told Arveco to include the tax on all the trucks, even those delivered after September 30, 1988. Arveco succeeded in placing the winning bid, but its bid was some ninety-seven million dollars less than the next lowest bid. On April 23, 1986, Arveco informed the Tank Command that it had not included the taxes as instructed because, as stated in its May 14 letter to the Tank Command, it believed it should include only excise tax as it considered to be "payable." On April 28, Arveco submitted a letter to the Tank Command expressing its intention to certify that its bid had *not* included an amount to cover any extension of the excise tax. However, on the same day, Arveco called the Tank Command's contract specialist and said it would rescind its April 28 letter. Arveco was then awarded the contract on May 14. Arveco changed its position again and informed the Tank Command that it had not included an

---

1. According to a grand jury subpoena concerning the same facts, the offering party (Arveco) came into being as follows: "In January 1985, Harsco Corporation entered into an agreement with General Automotive Corporation (GAC) which resulted in an entity known at the time as Arveco, and which later became BMY, for the purpose of bidding on a contract for the sale of 5-ton trucks to the U.S. Army Tank Automotive Command." J.A. at 236.

2. "B.0.1.1. Retail federal excise tax (RFET) is applicable to those vehicle Contract Line Item Numbers (CLINs) where indicated in this Section B. and the bid prices therefore include such tax."

amount for an extension of the federal excise tax. "Since the [excise tax] expires on October 1, 1988, we feel no tax is payable after that date and only payable taxes are included in ... our bid." (Letter of May 14, 1986 from Ronald P. Markwood, President of Arveco, to Mr. Sheill at the Tank Command).

At this point, the record goes silent as to what happened regarding the contract for the trucks until February 9, 1988, when Arveco requested in writing a contract price adjustment of $47,386,980 to reimburse Arveco for the tax on trucks to be delivered after October 1, 1988. Arveco submitted its price adjustment claim under the Contract Disputes Act, 41 U.S.C. §§ 604–613 (1988) ("Section 604" claim). Arveco submitted its price adjustment claim after the excise tax was extended by Congress in March 1987. Highway Revenue Act of 1987, P.L. 100–17, Sec. 502(a)(2), 101 Stat. 256 (changing the expiration date for this federal excise tax from October 1, 1988 to October 1, 1993). In submitting its price adjustment claim, Arveco stated that it had omitted the excise tax on trucks to be delivered after October 1, 1988. Arveco's claim was at first denied by the contracting officer, but on appeal from the contracting officer's decision, the price adjustment was granted by the Armed Services Board of Contract Appeals.

In deciding to sustain Arveco's price adjustment appeal, the Armed Services Board of Contract Appeals did not have before it an important document. According to a memorandum dated April 18, 1986 and prepared by John Witmer, Harsco's Tax Manager, the bid included excise tax for all trucks to be delivered under the contract:

> The bid specifications require that the bid proposal include federal excise tax. *BMY's bid included federal excise tax on all models to be produced during the term*

*of the contract despite the fact that the excise tax is scheduled to expire September 30, 1988.*

> It is possible IRS may question the gross vehicle weight of those trucks BMY considers to have a gross weight of 33,000 pounds or less. Should IRS prevail, we would owe excise tax on those vehicles. *Please note that the bid price included the excise tax and the only additional cost to us would be any interest on the tax due.*

("Witmer memorandum") (emphasis added). Partly based on this new evidence, the Army has moved for reconsideration and to reopen the Section 604 proceedings, but the Armed Services Board of Contract Appeals had not decided to reopen the proceedings as of July 1, 1993.

Into this labyrinth Arveco and the United States have led three federal jurisdictions without a mention of the trucks that were ordered. We assume they were delivered. The plot thickens when, on February 19, 1993, a federal grand jury in the Eastern District of Michigan issued a subpoena to Markwood to appear and produce documents. Markwood provided documents on April 6, and testified before the grand jury on September 28, after the court issued an order compelling his testimony and granting him immunity pursuant to 18 U.S.C. § 6002 (1988). The grand jury obtained corporate documents, including the Witmer memorandum, indicating that Arveco did in fact include all excise tax in its initial bid. The Army obtained an order allowing disclosure of these documents, pursuant to Federal Rule of Criminal Procedure 6(e). These documents were also provided to Lt. Col. Phillips, an Army Judge Advocate General officer assigned to the Department of Justice Civil Division.[3] Markwood did not argue before

---

**3.** Whether Lt. Col. Phillips's access to these memoranda violated Fed.R.Crim.P. 6(e) was not an issue in this case. However, in cases arising out of these facts, two courts have determined that Lt. Col. Phillips did not violate Rule 6(e). In *United States v. Seitz*, 1993 WL 501817, at *6 (S.D. Ohio Aug. 26, 1993), the district court found that

> Lt. Col. Phillips has executed a second supplemental declaration stating categorically that although the Army's counsel discussed the ex-

istence of the Witmer and Seitz memoranda with him, he did not gain access to them through the Army. Instead, the Civil Division sought and received a Rule 6(e) Order from Judge Smith January 25, 1993.

In another case involving the same facts, the Third Circuit implicitly determined that Lt. Col. Phillips did not have improper access to grand jury materials for the additional reason that Harsco voluntarily shared these memoranda with the Civil Division. *United States v. Witmer,* 30 F.3d

the district court, nor to the judge presiding over the grand jury proceeding, that Lt. Col. Phillips's access to the documents violated Rule 6(e). Instead, Markwood uses this alleged violation to support his argument before this Court that Phillips has a conflict of interest and that the subpoena was issued for an improper purpose. According to Markwood, this information, particularly the Witmer memorandum, created the suspicion that Arveco had filed a false request for a contract adjustment.

The Arveco documents provided the Department of Justice with information to issue a civil investigative demand ("CID")[4] to Markwood in its False Claims Act investigation. 31 U.S.C. §§ 3729–33 (1988). After being served with the CID, Markwood provided documents, but refused to testify because the ongoing grand jury investigation implicated his Fifth Amendment privilege. Markwood did not appear for his scheduled deposition. The Department of Justice informed him that it viewed his failure to appear as a failure to comply with the CID. Also, the Army used Markwood's refusal to appear to support its motion to reopen and for reconsideration of the Section 604 price adjustment claim before the Armed Services Board of Contract Appeals.

On May 24, 1993, the Department of Justice filed a petition to enforce the CID and requested an Order to Show Cause. 31 U.S.C. §§ 3733(j)(1) and (j)(5). On June 1, the district court issued an Order to Show Cause, requiring Markwood to appear for a hearing, and provided that Markwood could not serve or file any discovery requests without further leave of court. On June 15, Markwood filed a Motion to Vacate the Order to Show Cause arguing that the district court proceeded in an *ex parte* manner because the petition for enforcement was not served on Markwood at the time of filing. The district court declined to rule on this motion until the show cause hearing. On June 29, the district court conducted the show cause hearing on the petition for enforcement. The parties submitted briefs and argued their positions before the district court. The district court ordered Markwood to comply with the CID, denied Markwood's motion for a temporary stay of the enforcement of the CID, denied his motion to vacate the order to show cause, and ordered the documents in this proceeding to be unsealed.[5] Markwood appeared for his deposition on October 5, 1993, and refused to answer most of Phillips's questions, invoking his Fifth Amendment privilege.[6] Markwood now requests that the parties be returned to their status quo before the enforcement of the false claims CID, meaning that the government should be ordered to destroy any record of his deposition, as well as any related notes, and furthermore should be forbidden from using any information gained from his deposition.

■ The issues we may review on appeal are limited to those first presented to and considered by the district court, unless review of an issue is necessary in order to prevent manifest injustice, promote procedural efficiency, or correct clear errors or omissions. *Brown v. Crowe,* 963 F.2d 895, 898 (6th Cir.1992). Although Markwood argued to the district court that the petition for enforcement was *ex parte,* he did not raise the separate issue, which he now urges on appeal, of whether the government's Request for an Order to Show Cause was *ex parte.* Therefore, we will not consider this issue.

1489 (3d Cir.1994), *aff'g,* 835 F.Supp. 208, 216 (M.D. Pa., 1993) ("*Witmer II*") (*Witmer II* is a reconsideration of *Witmer I,* 835 F.Supp. 201 (M.D. Pa., 1993)). In both *Witmer II* and *Seitz,* the courts determined that the appellants should have raised their Rule 6(e) objections before the judge presiding over the grand jury proceedings.

4. Although here we have used the term "CID" without explanation, we believe it is a type of administrative subpoena. Because everyone involved in this litigation uses the term, we will use

CID and administrative subpoena interchangeably.

5. On September 16, 1993, a panel of this Court granted Markwood's motion to seal the pleadings filed in this Court. However, this panel unsealed all documents in this matter at oral argument.

6. 31 U.S.C. § 3733(h)(7) provides that a person giving oral testimony in compliance with a false claims CID may not assert his Fifth Amendment privilege against self-incrimination generally, but only on a question-by-question basis.

We do consider Markwood's second new argument on appeal, questioning whether the district court correctly determined that a false claims CID is an administrative subpoena. Markwood could not have anticipated the legal reasoning the district court would use in its opinion, and we must review whether the district court correctly applied the case law regarding administrative subpoenas to this case. Thus, Markwood's second argument comes within an exception to the general rule enunciated in *Brown*. *Id.*

■ The only issue in this case is whether the district court properly granted the petition for enforcement of the false claims CID. The district court was first called upon to decide whether the Department of Justice complied with the statute empowering it to issue the CID. The district court also had to apply the judicially-created standards for enforcement of administrative subpoenas and apply them to the facts of the case at issue. We review, therefore, whether the district court properly determined that the false claims CID and the petition for enforcement complied with 31 U.S.C. § 3733 and other judicially-created standards for enforcement of administrative subpoenas. We review *de novo* the district court's interpretation and application of Section 3733 [7] and the case law regarding enforcement of adminis-

trative subpoenas. *United States v. Braggs*, 23 F.3d 1047, 1049 (6th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 274, 130 L.Ed.2d 191 (1994).

■ As a preliminary matter, we do not agree with Markwood's suggestion that a false claims CID cannot be enforced like other administrative subpoenas. Markwood contends that a CID is not an administrative subpoena [8] because it may be issued only under the terms of 31 U.S.C. § 3733, and not under the less detailed "general administrative subpoena" statute.[9] Also, Markwood believes that Congress, by making false claims CIDs subject to the Federal Rules of Civil Procedure, intended false claims CIDs to be enforced differently from other administrative subpoenas.[10] Finally, Markwood argues that, because a false claims CID is not part of a general regulatory scheme, parties receiving a CID are not fairly forewarned that information may be required from them. Markwood also insists that, because a false claims CID is not part of a specific regulatory scheme, it may not be enforced summarily, and certainly not without the right to trial-type discovery prior to enforcement.

First, the CID Markwood received is an administrative subpoena partly because the Department of Justice is an executive administrative agency. 5 U.S.C. §§ 101, 105, 500,

---

7. For questions of statutory interpretation, it is clear that the starting point for our inquiry is the language used by Congress. *United States v. Hans*, 921 F.2d 81, 82 (6th Cir.1990). *See also Estate of Cowart v. Nicklos Drilling Co.*, —— U.S. ——, ——, 112 S.Ct. 2589, 2594, 120 L.Ed.2d 379 (1992) (quoting *Demarest v. Manspeaker*, 498 U.S. 184, 190, 111 S.Ct. 599, 603, 112 L.Ed.2d 608 (1991)). "[W]hen a statute speaks with clarity to an issue[,] judicial inquiry into the statute's meaning, in all but the most extraordinary circumstance, is finished." *Id.; see also United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989) (observing that "[T]he plain meaning of legislation should be conclusive, except in 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intention of the drafters.'") (citation omitted). However, when there is an ambiguous term in a statute, or when a term is undefined or its meaning unclear from the context of the statute, it is our duty to examine the legislative history in order to render an interpretation that gives effect to Congress's intent. *In re Vause*, 886 F.2d 794, 801 (6th Cir.1989).

8. However, later in his brief, Markwood seems to concede that a false claims CID is an administrative subpoena by urging this Court to accept the proposition that an administrative subpoena (like this one) is subject to *de novo* review, citing *McNary v. Haitian Refugee Center, Inc.*, 498 U.S. 479, 493, 111 S.Ct. 888, 896, 112 L.Ed.2d 1005 (1991). Furthermore, *McNary* is inapposite. *McNary* does not concern judicial enforcement of an administrative subpoena, but, in part, concerns standards of judicial review of administrative agency determinations of "Special Agricultural Worker" status under the Immigration Reform and Control Act of 1986 and the Immigration and Nationality Act.

9. Inspector General Act of 1978, 5 U.S.C. app. 3 § 6(a)(4) (1988).

10. However, the Federal Rules of Civil Procedure do not apply if their application is inconsistent with Section 3733. 31 U.S.C. § 3733(j)(6).

551 (1988). Further, Congress has given the Department of Justice a particular type of investigative tool, the false claims civil investigative demand, to enable it to investigate whether there is a basis for remedying a false claim made against the United States. 31 U.S.C. § 3733. A false claims CID may be issued to "any person" having information "relevant to a false claims law investigation." 31 U.S.C. 3733(a)(1). That person may be required to give oral testimony, answer written interrogatories, produce documents, or all of the above. *Id.* As Black's Law Dictionary states, a subpoena is simply "a command to appear at a certain time and place to give testimony upon a certain matter" and a subpoena duces tecum "requires production of books, papers and other things." **Black's Law Dictionary** 1426 (6th ed.1990). Although Congress has chosen to call this subpoena by another name, a false claims CID is, at its essence, a subpoena issued by an administrative agency. Furthermore, the legislative history regarding the false claims CID bears out this conclusion.

Congress crafted the false claims CID after the antitrust CID statute and explicitly made the case law concerning antitrust CIDs applicable to false claims CIDs. As both parties here point out, Congress intended the false claims CID to function analogously to the antitrust CID. 15 U.S.C. §§ 1311–14. It is clear from the legislative history that Congress viewed an antitrust CID as a type of administrative subpoena, and by analogy and legislative intent, also viewed the false claims CID similarly. The Senate Committee on the Judiciary explained that "the CID authority granted by [the False Claims Amendments Act of 1986] is identical to that available to the Justice Department's Antitrust Division [under the Hart–Scott–Rodino Antitrust Improvements Act of 1976] ... and the Committee intends that the legislative history and case law interpreting that statute [15 U.S.C. §§ 1311–14], fully apply to this bill."

False Claims Amendments Act of 1986, Senate Committee on the Judiciary, S.Rep. No. 345, 99th Cong., 2d Sess. 33 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5298; *see also id.* at 5280–81. In its report on the Hart–Scott–Rodino Antitrust Improvements Act of 1976, the House Committee on the Judiciary stated that an antitrust CID is a "special kind of civil subpoena," H.R.Rep. No. 1343, 94th Cong., 2d Sess. 13 (1976), *reprinted in* 1976 U.S.C.C.A.N. 2596, 2596, and "[l]ike any other civil administrative subpoena, [an antitrust] CID has no compulsory force unless and until a federal judge upholds its legality, by issuing an order enforcing compliance." *Id.* at 2607. Thus, like its predecessor the antitrust CID, Congress considered the false claims CID to be an administrative subpoena.[11] While consistency of terminology would make our work easier, as Ralph Waldo Emerson said, "A foolish consistency is the hobgoblin of little minds, adored by little statesmen and philosophers and divines."[12] Finally, at least two other Circuits have determined that civil investigative demands are administrative subpoenas. *FTC v. Invention Submission Corp.,* 965 F.2d 1086, 1087 (D.C.Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1255, 122 L.Ed.2d 654 (1993) (FTC civil investigative demand); *Witmer II,* 835 F.Supp. at 212, *aff'd,* 30 F.3d 1489 (3d Cir. 1994) (False Claims Act CID).

 Having decided this issue, it must be emphasized that a district court's role in the enforcement of an administrative subpoena is a limited one. *See Sandsend Fin. Cons. v. Federal Home Loan Bank Bd.,* 878 F.2d 875, 879 (5th Cir.1989) (citing *FTC v. Texaco,* 555 F.2d 862, 872 (D.C.Cir.) (holding that the role of a court in reviewing an administrative subpoena is "strictly limited"), *cert. denied,* 431 U.S. 974, 97 S.Ct. 2939, 2940, 53 L.Ed.2d 1072 (1977)). A district court's first task in determining whether to grant a petition for enforcement is to decide

**11.** Also, in discussing the 1976 amendments to the 1962 Antitrust Civil Process Act, Congress cited with approval an Eighth Circuit case, *Petition of Gold Bond Stamp Co.,* 221 F.Supp. 391 (D. Minn.1963), *aff'd,* 325 F.2d 1018 (8th Cir. 1964), wherein that Court analogized an antitrust CID to the administrative subpoenas issued by the Secretary of Labor and the Federal Trade Commission and applied the *Oklahoma Press* and *Morton Salt* standards for enforcement. 1976 U.S.C.C.A.N. at 2605 n. 18.

**12.** *Essays: First Series* (1841) (quoted by John Bartlett, **Bartlett's Familiar Quotations** 431 (16th ed.1992)).

whether the agency has met the statutory requirements pertaining to the issuance and enforcement of the subpoena. Next, the court must consider whether the agency has satisfied or complied with the judicially-created standards for enforcement of the subpoena.

In the 1940s, the Supreme Court began articulating the current judicial standards for administrative subpoena enforcement. In a show of deference to the statutory authority of administrative agencies to perform investigative functions, the Supreme Court in *Endicott Johnson Corp. v. Perkins* determined that the district court should have enforced the subpoena where "the evidence sought by the subpoena was not plainly incompetent or irrelevant to any lawful purpose of the Secretary in the discharge of her duties." 317 U.S. 501, 509, 63 S.Ct. 339, 343, 87 L.Ed. 424 (1943). In *Oklahoma Press Publishing Co. v. Walling,* the Court extended this principle of *Endicott Johnson* to the enforcement of a subpoena duces tecum issued by the Wage and Hour Administrator of the United States Department of Labor to a publishing company, pursuant to the Fair Labor Standards Act. 327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614 (1946). *Oklahoma Press* held that Fourth Amendment concerns are satisfied if the district court determined that the agency's demand for production of documents is

authorized by Congress, is for a purpose Congress can order, and the documents sought are relevant to the inquiry. Beyond this the requirement of reasonableness, including particularity in "describing the place to be searched, and the person or things to be seized"... comes down to [whether] specification of the documents to be produced [is] adequate, but not excessive, for the purposes of the relevant inquiry. Necessarily ... this cannot be reduced to [a] formula; for relevancy and adequacy or excess in the breadth of the subpoena are matters variable in relation to the nature, purposes and scope of the inquiry.

*Id.* at 209, 66 S.Ct. at 506.

In the 1950s, in a case involving the Federal Trade Commission's power to obtain information through orders requiring salt manufacturers to file certain reports, the Supreme Court further refined and applied the principles of *Endicott Johnson* and *Oklahoma Press.* The Supreme Court, in *United States v. Morton Salt Co.,* 338 U.S. 632, 70 S.Ct. 357, 94 L.Ed. 401 (1950), examined the respective functions and powers of the Federal Trade Commission and the federal courts where Congress had given an agency the power to investigate, including the power to require reports. The Court stated:

The only power that is involved here is the power to get information ... Because judicial power is reluctant if not unable to summon evidence until it is shown to be relevant to issues in litigation, it does not follow that an administrative agency charged with seeing that the laws are enforced may not have and exercise powers of original inquiry. It has a power of inquisition, if one chooses to call it that, which is not derived from the judicial function. It is more analogous to the Grand Jury, which does not depend on a case or controversy for power to get evidence but can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not. When investigative and accusatory duties are delegated by statute to an administrative body, it, too, may take steps to inform itself as to whether there is probable violation of the law.

338 U.S. 632, 641, 70 S.Ct. 357, 364, 94 L.Ed. 401. The Supreme Court in *Morton Salt* went on to say that a federal court's adjudicatory task regarding the enforcement of an agency investigatory tool (there orders requiring reports) is limited as follows:

[I]t is sufficient if the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant. "The gist of the protection is ... that the disclosure sought shall not be unreasonable."

*Morton Salt,* 338 U.S. at 652–53, 70 S.Ct. at 369 (quoting *Oklahoma Press,* 327 U.S. at 208, 66 S.Ct. at 505).

The next important Supreme Court case addressing judicial standards applicable to enforcement of an administrative subpoena was *United States v. Powell,* 379 U.S. 48, 85

S.Ct. 248, 13 L.Ed.2d 112 (1964). In that case, a corporate taxpayer was issued an administrative summons by the Internal Revenue Service. The district court granted the petition for enforcement, although it limited the government's examination of the records. The Third Circuit reversed, and denied enforcement of the summons altogether. The Supreme Court reversed, holding that the government did not have to make a showing of probable cause to suspect tax fraud to obtain enforcement, but only need show that

> the investigation will be conducted pursuant to a legitimate purpose, that the inquiry may be relevant to the purpose, that the information sought is not already within the Commissioner's possession, and that the administrative steps required by the Code have been followed.... It is the court's process which is invoked to enforce the administrative summons and the standard then becomes whether the court's process is abused. Such an abuse would take place if the summons had been issued for an improper purpose, such as to harass the taxpayer or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation. The burden of showing an abuse of the court's process is on the taxpayer, and it is not met by a mere showing, as was made in this case, that the statute of limitations for ordinary deficiencies has run or that the records in question have already been once examined.

*Id.* at 57–58, 85 S.Ct. at 255. *See also EEOC v. K–Mart Corp.,* 694 F.2d 1055, 1065–66 (6th Cir.1982) (applying the standards of *Morton Salt* and *Powell* in a case involving enforcement of EEOC subpoenas); *United States v. Will,* 671 F.2d 963, 968 (6th Cir.1982) (stating that "a proceeding seeking enforcement of an IRS summons is an adversary proceeding ... of a summary nature ....") (citing *United States v. Powell,* 379 U.S. at 58, 85 S.Ct. at 255). Thus, after *Powell,* an agency need show only that the investigation had a legitimate purpose, that its inquiry may be relevant to that purpose, that it did not already have the information and that it otherwise followed any statutory requirements. *Powell* also gave subpoena recipients an additional defense against enforcement (in addition to

the defense that one or more of these standards weren't met). An agency investigatory tool might be resisted if the agency acted in "bad faith." Examples of agency "bad faith" included harassment of the recipient of the subpoena, or a conscious attempt by the agency to pressure the recipient to settle a collateral dispute.

Finally, in *United States v. LaSalle Nat'l Bank,* 437 U.S. 298, 98 S.Ct. 2357, 57 L.Ed.2d 221 (1978), the Supreme Court refined the "bad faith" defense first articulated in *Powell.* *LaSalle* held that agency "bad faith" could not be asserted based on the improper motivations of individual agency employees, but must be institutionalized bad faith. The Court noted that, "while the special agent is an important actor in the process, his motivation is hardly dispositive ... the dispositive question in each case ... is whether the [agency] is pursuing the authorized purposes in good faith." 437 U.S. at 317–18, 98 S.Ct. at 2368. Furthermore, *LaSalle* held that the party asserting that the agency acted in bad faith bears a heavy burden of proof. *Id.* at 316, 98 S.Ct. at 2367.

After *LaSalle,* the Third Circuit had occasion to examine the bad faith defense, and distinguished the "bad faith" defense from the "abuse of the court's process" defense. In *SEC v. Wheeling–Pittsburgh Corp.,* the Third Circuit observed that "[b]ad faith connotes a conscious decision by an agency to pursue a groundless allegation without hope of proving that allegation.... In contrast, an agency could be found to be abusing the court's process if it vigorously pursued a charge because of the influence of a powerful third party without consciously and objectively evaluating the charge." *SEC v. Wheeling–Pittsburgh Steel Corp.,* 648 F.2d 118, 125 (3d Cir.1981) (en banc). In *Wheeling–Pittsburgh,* the district court refused to enforce an SEC subpoena because it found that the SEC, although acting in good faith, had permitted its investigatory process to be abused, and therefore enforcement would be an abuse of the court's process. The district court found that the SEC's investigatory process had been abused by a course of events whereby a competitor of Wheeling–Pittsburgh had enlisted the aid of U.S. Senator

Lowell Weicker to oppose the extension of federal loan guarantees to Wheeling–Pittsburgh. After a Senate subcommittee approved the loan guarantees, Senator Weicker requested an SEC investigation of Wheeling–Pittsburgh.

Several Circuits have applied these judicially-created standards to determine whether to enforce administrative subpoenas. The Fifth Circuit in *Sandsend* held that a court's inquiry into the enforcement of an administrative subpoena is limited to two questions: "(1) whether the investigation is for a proper statutory purpose, and (2) whether the documents the agency seeks are relevant to the investigation." 878 F.2d at 879; *see also Burlington No. R.R. Co. v. Office of Inspector General, R.R. Retirement Bd.*, 983 F.2d 631 (5th Cir.1993). The District of Columbia Circuit, in *FTC v. Invention Submission Corp.*, has also recognized the limited nature of the court's inquiry regarding the enforcement of administrative subpoenas. 965 F.2d 1086, 1089 (D.C.Cir.1992), *cert. denied,* — U.S. ——, 113 S.Ct. 1255, 122 L.Ed.2d 654 (1993) (stating, "it is well established that a district court must enforce a federal agency's investigative subpoena if the information sought is 'reasonably relevant'... and not 'unduly burdensome' to produce ....") (citations omitted).

▆ In *Witmer II*, the Third Circuit agreed with the district court that a false claims CID is an administrative subpoena and should be enforced if "'the inquiry is within the authority of the agency, the demand is not too indefinite and the information is reasonably relevant' to the agency's inquiry." *Witmer II*, 835 F.Supp. at 220 (quoting *United States v. Morton Salt Co.*, 338 U.S. 632, 652, 70 S.Ct. 357, 369, 94 L.Ed. 401 (1950)). The *Witmer II* court continued, "[i]n other words, the court must determine whether 'the court's process would or would not be abused by enforcement.'" *Id.* (citing *SEC v. Wheeling–Pittsburgh Steel Corp.*, 648 F.2d 118, 125 (3d Cir.1981)). This demonstrates that a district court is not a "rubber

stamp" for agency demands for the production of information. A district court's task is limited, however, to making decisions concerning whether the subpoena, and the enforcement process, are authorized by Congress, whether the information sought is relevant to the agency's investigation, and whether or not the investigation and enforcement of the subpoena is an abuse of the court's process. The District of Columbia Circuit has summarized the task of the district court this way:

> [W]hile the court's function is "neither minor or ministerial," *Oklahoma Press Publishing Co. v. Walling*, 327 U.S. at 217 n. 57, 66 S.Ct. at 509 n. 57, the scope of the issues which may be litigated in an enforcement proceeding must be narrow, because of the important governmental interest in the expeditious investigation of possible unlawful activity. As the Ninth Circuit has noted, the "very backbone of an administrative agency's effectiveness in carrying out the congressionally mandated duties of industry regulation is the rapid exercise of the power to investigate...." *FMC v. Port of Seattle*, 521 F.2d 431, 433 (9th Cir.1975).

*FTC v. Texaco, Inc.*, 555 F.2d 862, 872–73 (D.C.Cir.) (en banc), *cert. denied,* 431 U.S. 974, 97 S.Ct. 2939, 2940, 53 L.Ed.2d 1072 (1977). Although the false claims CID is not directly related to "industry regulation," the need for expeditious enforcement is the same. Congress intended the false claims CID to provide the Department of Justice with a means to assess quickly, and at the least cost to the taxpayers or to the party from whom information is requested, whether grounds exist for initiating a false claim suit under 31 U.S.C. §§ 3729–32, particularly in cases of possible procurement fraud.[13] We do not agree with Markwood that Congress intended the false claims CID to be enforced in a way other than we have discussed.

---

13. "The purpose of S. 1562, the False Claims Reform Act, is to enhance the Government's ability to recover losses sustained as a result of fraud.... While it may be difficult to estimate the exact magnitude of fraud in Federal pro-

grams and procurement, the recent proliferation of cases among some of the largest Government contractors indicates that the problem is severe." S.Rep. No. 345, 99th Cong., 2d Sess. 1–2 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266.

In this case, Markwood has already produced the documents demanded by the United States and is now only resisting the United States' ability to retain information from his oral deposition. In this instance, we need not determine whether the United States' demand met the requirement of definiteness for production of documents. We believe that the subpoena was properly enforced if 1) the subpoena complied with the terms of 31 U.S.C. § 3733, 2) the subpoena sought relevant testimony from Markwood, 3) the information sought is not already in the agency's possession, and 4) enforcement of the subpoena will not abuse the court's process. We now review the district court's decision to determine whether it correctly applied these standards in granting the petition for enforcement.

## A. Whether the subpoena, and the enforcement proceeding, complied with Section 3733.

Markwood is not arguing before us that the subpoena itself does not comply with 31 U.S.C. § 3733. Instead, he argues that the United States has not followed the statutory procedure for enforcement of the subpoena. He asserts that the United States impermissibly filed an *"ex parte"* Petition for Summary Enforcement of the CID, resulting in the district court's issuance of an *"ex parte"* Order to Show Cause. Specifically, Markwood argues that the United States denied him notice and an opportunity to be heard regarding the petition, in violation of his statutory and due process rights. Markwood believes that the district court, by issuing its Order to Show Cause *before* he received the petition, "ruled" in the government's favor without giving him a hearing. Because Markwood admits that he was served with the petition, the crux of his contention seems to be that the petition was *"ex parte"* because it was not served in a timely manner, in violation of Federal Rule of Civil Procedure 5 and 31 U.S.C. § 3733(j)(6).[14] In addition, Markwood believes he had a right, not only to unlimited discovery, but to discovery

*before* the court issued its Order to Show Cause.

Markwood does not specify the date on which he was served with the petition and does not cite in his brief a statutory provision by which this Court might determine the timeliness of the service. It appears that Markwood was served both the Order to Show Cause and the Petition on June 2, 1993, the day after the district court issued its Order to Show Cause. In its Opinion and Amended Order of August 23, the district court found that "it is undisputed that Respondent Markwood was served with a copy of the enforcement petition and supporting documents," but does not otherwise discuss the timeliness issue. The district court concluded that the order to show cause is not a substantive order, but a procedural order requiring Markwood to give reasons why the CID should not be enforced, including a substantial showing that the court's process will be abused by enforcement.

Section 3733(j)(6) states that the Federal Rules of Civil Procedure apply to CID enforcement proceedings, unless their application is inconsistent with the false claims CID statute. Federal Rule of Civil Procedure 5(a) requires that pleadings, and other various motions and papers "shall be served on each of the parties." Rule 5 does not specify a time period for service. Rule 6(a) states that the time period for service will be prescribed in one of several ways: by the Federal Rules of Civil Procedure, by local rules, by order of court, or by any applicable statute. By the terms of Section 3733, we must examine first whether a time period is prescribed by, or delineated in any way by that statute. However, Section 3733 does not prescribe a time for service of the petition.

Section 3733(j)(1) requires that a petition for enforcement be served on the person resisting the CID. It does not specify a time period for serving a copy of the petition, or any related motion or paper. *See Seitz*, 1993 WL 501817, at *2 (observing that "although it would be better practice to serve the petition on the respondent when it is

---

**14.** 31 U.S.C. § 3733(j)(6) provides, "The Federal Rules of Civil Procedure shall apply to any petition under this subsection, to the extent that such

rules are not inconsistent with the provisions of this section."

filed, failure to do so does not violate 31 U.S.C. § 3733(j)(1).”). Section 3733(j)(1) states: “the Attorney General may file ... and serve upon [a person failing to comply with a CID] a petition for an order of such court for the enforcement of the [CID].” The plain meaning of the language of Section 3733 leads us to conclude that Congress is not requiring the United States to serve the party resisting the CID with a petition for enforcement *before* the petition is filed or *before* a district court issues an order to show cause. Because the enforcement proceeding under Section 3733(j)(1) is summary, we do not think Congress intended that service of the petition be made before filing. By using the language “may file ... and serve,” we believe Congress is requiring service within a reasonable amount of time after filing. We believe that the district court should set a date by which the petition should be served, as it is empowered to do under Section 3733(j)(5), which gives the district court the power to issue whatever order is necessary for enforcement of the CID. In addition, we do not believe the local rule requiring service *before* filing, E.D. Mich. L.R. § 7.1(g), applies here because it is inconsistent with Section 3733(j)(1). Because neither the CID statute, the Federal Rules of Civil Procedure, nor the local rules provide the proper time period for service, we believe that in Section 3733(j)(1) enforcement proceedings the district court should prescribe a date by which a person resisting enforcement should be served with the petition. The district court is in the best position to determine, on a case-by-case basis, a reasonable time by which the person resisting the CID should be served with the petition.

While Markwood argues that a lack of a time period for service of the petition determines this issue in his favor, Federal Rule of Civil Procedure 61 requires reversal only if any error made by the district court affected the substantial rights of a party, and then only if the party is prejudiced by the error. “[I]t is a ‘well-settled rule that an erroneous ruling which relates to the substantial rights of a party is ground for reversal unless it affirmatively appears from the whole record that it was not prejudicial.’” *Jordan v. Paccar, Inc.*, 37 F.3d 1181,

1184 (6th Cir.1994) (quoting *McCandless v. United States*, 298 U.S. 342, 347–48, 56 S.Ct. 764, 766, 80 L.Ed. 1205 (1936)). We do not believe that Markwood’s procedural right to service of the petition was infringed because, although not setting a date for service of the petition, the service of the petition was procedurally adequate. Markwood was served with a copy of the petition on June 2, 1993. The show cause hearing occurred on July 29, almost two months after Markwood was served, giving him ample time to respond to the petition. We conclude that Markwood was timely served with the petition and no aspect of the enforcement proceeding took place *ex parte* as he argues. Thus, Markwood’s procedural rights were not violated; furthermore, even if we thought his substantial rights were violated he was not prejudiced thereby because he was served within a reasonable time (nine days) after the petition was filed and fully briefed and argued his position against enforcement.

Markwood also contends that he was denied his statutory and Due Process rights to an opportunity to be heard regarding the court’s curtailment of discovery. He believes he should have had a hearing regarding the court’s decision to curtail discovery *before* the court issued its order to show cause. He argues that by the time he received notice of the enforcement proceeding, his right to discovery was curtailed without an opportunity for him to be heard on the matter. He claims he was unable to gather evidence to show that the CID was being used for the improper purpose of gathering information for use by the Army in the Armed Services Board of Contract Appeals proceedings. We believe these arguments are without merit.

First, the district court’s order to show cause stated that “no party may serve or file any discovery requests without further leave of court.” Markwood did not ask leave of the court to conduct discovery on any issue, preferring to argue (in his Motion to Vacate the Order to Show Cause) that, because Congress made the Federal Rules of Civil Procedure applicable to CID enforcement proceedings, he should be allowed to conduct discovery as a matter of right. 31 U.S.C. § 3733(j)(6); Fed.R.Civ.P. 26(a) and 26(b)(1).

This argument is not persuasive for two reasons.

First, Rules 26(a)(1) and 26(b) do not give a party the right to unlimited discovery. Both rules provide that a court may limit information to be disclosed and may limit the scope of discovery. Further, Federal Rule of Civil Procedure 81(a)(3) states:

> These rules apply to a proceeding to compel the giving of testimony or production of documents in accordance with a subpoena issued by an officer or agency of the United States under any statute of the United States except as otherwise provided by statute or by rules of the district court or by order of the court in the proceedings.

This rule permits the district court to limit discovery as it did in this case. *See Donaldson v. United States*, 400 U.S. 517, 528–29, 91 S.Ct. 534, 540, 27 L.Ed.2d 580 (1971) (holding that "Rule 81(a)(3) [specifically recognizes] that a district court, by local rule or by order, may limit the application of the [Federal Rules of Civil Procedure] in a summons proceeding.").

Second, as we have discussed, Markwood incorrectly asserts that a CID is not an administrative subpoena and not subject to the case law governing the enforcement of administrative subpoenas. Markwood argues that Congress intended persons subject to CIDs, unlike persons subject to administrative subpoenas, to have discovery on any relevant issue regarding the subpoena. However, the Federal Rules of Civil Procedure were written for post-complaint litigation. Most of the Federal Rules of Civil Procedure are simply inapplicable to the precomplaint enforcement of an administrative subpoena. We find no help in Section 3733(j)(6) regarding what Congress had in mind by making the Federal Rules of Civil Procedure applicable to a false claims CID enforcement proceeding. However, while the legislative history to the false claims act CID does not discuss how Congress intended the Federal Rules of Civil Procedure to apply to a pre-complaint subpoena, the legislative history to the antitrust CID reveals that when Congress thought about the applicability of the Federal Rules of Civil Procedure to the antitrust CIDs, it was thinking of the civil discovery protections concerning how discovery is to be conducted; Congress did not discuss whether a party has a right to discovery or on what issues. *See* 1976 U.S.C.C.A.N. at 2603–04. Other than this legislative history, we have no help from Congress concerning the meaning of Section 3733(j)(6) and therefore turn to the abundant case law on the scope of discovery in administrative subpoena enforcement proceedings.

The scope of discovery in the context of an administrative subpoena enforcement proceeding is commensurate with the nature of the administrative subpoena itself. In *SEC v. McGoff*, the District of Columbia Circuit held that in summary subpoena enforcement proceedings, discovery is generally disallowed absent "extraordinary circumstances." 647 F.2d 185, 193 (D.C.Cir.), *cert. denied*, 452 U.S. 963, 101 S.Ct. 3114, 69 L.Ed.2d 974 (1981). In *McGoff*, the subject of a Securities and Exchange Commission subpoena claimed he was a target because he was a vocal critic of President Carter's administration. The Court held that, under the facts, this claim did not amount to an extraordinary circumstance requiring discovery. 647 F.2d at 193–94; *see also United States v. Aero Mayflower Transit Co., Inc.*, 831 F.2d 1142, 1146 (D.C.Cir.1987) (reasoning that " 'discovery may be available in some subpoena enforcement proceedings where the circumstances indicate that further information is necessary for the courts to discharge their duty.' ") (quoting *SEC v. Dresser Indus.*, 628 F.2d 1368, 1388 (D.C.Cir.), *cert. denied*, 449 U.S. 993, 101 S.Ct. 529, 66 L.Ed.2d 289 (1980)). Even if discovery may be appropriate in some instances, "as a general matter, a defendant is not 'entitled to engage in counter-discovery to find grounds for resisting' a subpoena." *In re EEOC*, 709 F.2d 392, 400 (5th Cir.1983) (quoting *United States v. Litton Indus., Inc.*, 462 F.2d 14, 17 (9th Cir.1972)).

Finally, in a case involving the enforcement of an Internal Revenue Service summons, we have said,

> there is no unqualified right to pretrial discovery in a summons enforcement pro-

ceeding. To impose such a right would often destroy the summary nature of such a proceeding. Rather, the use of discovery devices in summons enforcement proceedings should be limited to those cases where a taxpayer makes a preliminary and substantial demonstration of abuse.

*United States v. Will,* 671 F.2d 963, 968 (6th Cir.1982) (citing *United States v. Moon,* 616 F.2d 1043, 1047 (8th Cir.1980) (reasoning that "an application of discovery rules which would destroy the summary nature of enforcement proceedings is not required")); *see also In re Office of Inspector General, R.R. Retirement Bd.,* 933 F.2d 276, 277–78 (5th Cir.1991) ("discovery is only allowed in the exceptional cases 'where the circumstances indicate that further information is necessary for the courts to discharge their duty' ") (citation omitted). The Circuits appear to agree that the summary nature of enforcement proceedings must be preserved by limiting discovery. Our rule in *Will* would permit discovery in an administrative subpoena enforcement proceeding only after the party subject to the subpoena makes a "preliminary and substantial demonstration of abuse" of the court's process. 671 F.2d at 968.

██ Our reading of Sections 3729–33 gives us no reason to alter this rule in the context of a false claims CID. The district court considered at length Markwood's reasons for believing that the CID was issued for improper purposes and rejected each argument. As discussed below, we agree that the "evidence" of impropriety Markwood points to is merely an assertion of impropriety, and does not amount to a substantial demonstration that the government is abusing the court's process in enforcing this CID. We conclude that the district court properly denied discovery because Markwood did not make a substantial demonstration of abuse of the Court's process.

██ Third, Markwood's general assertion that his Due Process rights were violated is

also meritless.[15] Markwood does not identify the liberty or property interest at stake here and does not tell the Court in what way the pre-enforcement hearing he received was constitutionally insufficient to protect his unspecified liberty or property interest. Furthermore, even if the Fifth Amendment required a full adversarial hearing before a federal judge, this was the type of hearing Markwood received. Finally, the statute does not give Markwood a right to a hearing on the discovery issue *before* his show cause hearing, and certainly he is not entitled to a hearing on the issue of discovery where he did not ask the court for leave to conduct discovery nor made the requisite showing of abuse of the court's process.

**B. Whether the information sought was relevant and whether it was already in the possession of the Department of Justice.**

Markwood does not assert that the United States is seeking irrelevant evidence and neither does he assert that the Department of Justice has the information it seeks from his testimony.[16] Rather, he claims that the United States is entitled to issue a CID only when the information sought is an "absolute necessity," and not, as the statute says, "[w]henever the Attorney General has reason to believe that any person may be in possession ... of any ... information relevant to a false claims law investigation." 31 U.S.C. § 3733(a)(1). He argues that the United States could have gotten the same information from the Armed Services Board of Contract Appeals proceedings or from the grand jury proceedings.

██ Markwood's assertion that the Department of Justice could have obtained the same information from the grand jury proceedings reflects a substantial lack of understanding of the state of evolution of the legislation authorizing false claims CIDs. As the legislative history of the False Claims Amendment Act reveals, one of Congress's

---

15. We assume he means his Fifth Amendment Due Process rights, although he did not cite the United States Constitution.

16. In any event, the record demonstrates that Markwood had information relevant to the false

claims investigation. He was directly involved in preparing the bid, he signed the bid as President of Arveco, and he signed the certification for the price adjustment to the contract as Vice President of BMY.

purposes in creating a false claims CID was to enable the Department of Justice to obtain information no longer available to it after the decision in *United States v. Sells Engineering, Inc.*, 463 U.S. 418, 103 S.Ct. 3133, 77 L.Ed.2d 743 (1983). *Sells* held that Rule 6(e) of the Federal Rules of Criminal Procedure prohibits the disclosure of grand jury materials for civil use without a court order. *Id.* at 440, 103 S.Ct. at 3146. If the government desires to obtain grand jury materials for civil use, it must make a showing of a particularized need for the materials. *Id.* at 445, 103 S.Ct. at 3149. Thus, Rule 6(e) grants a very substantial protection against abuse of the grand jury proceedings by the government in order to obtain information for civil investigations. Consequently, after *Sells*, Congress determined there was a need for an investigative tool to aid the Department of Justice in obtaining relevant information relating to possible false claims. As the Senate Committee on the Judiciary observed,

> Currently, the Civil Division of the Department relies primarily on two sources for investigation of civil fraud cases: the work of agency Inspectors General (IGs) and material developed in criminal investigations, usually through the use of grand jury subpoenas. However, since the Supreme Court's decision in *United States v. Sells Engineering Co. [Inc.]* ... interpreting Rule 6(e) of the Rules of Criminal Procedure, the Civil Division has been largely unable to gain access to the information developed before the grand jury. Therefore, in addition to supplementing the investigative powers of the IGs, the CID authority would permit the Civil Division to gain access to evidence of fraud which might currently be unavailable to it due to the Supreme Court's interpretation of Rule 6(e).

S.Rep. No. 345, 99th Cong., 2d Sess. 33 (1986), *reprinted in* 1986 U.S.C.C.A.N. at 5298. Therefore, Markwood's claims—that the CID was improper because the Attorney General failed to show that the information was absolutely necessary, and because the Department of Justice could have obtained the information from the grand jury proceedings—are baseless. Markwood also suggests that the Department of Justice could have gotten the information it desired from the Armed Services Board of Contract Appeals proceedings. Even if this were true, we find no statute or case law requiring the Department of Justice to obtain the information it desires from another agency's proceedings when it is authorized to conduct its own investigation. Further, the False Claims Act, 31 U.S.C. §§ 3729–33, does not require the Department of Justice to gather information from other agencies before conducting its own investigation.

## C. Whether the court's process was abused by the enforcement of the CID.

Markwood claims that the district court erred in enforcing the CID because the record demonstrated that the Department of Justice issued it for an improper purpose. Although Markwood has not stated it this way, we take him to mean that the Department of Justice issued the CID in bad faith. Essentially, Markwood argues that because Lt. Col. Phillips, who issued the CID, was an Army attorney assigned to the Department of Justice, he had a conflict of interest that allowed or caused him to use the CID for the improper purpose of gathering information for the Army's Armed Services Board of Contract Appeals litigation. To support this argument, Markwood asserts that another Army attorney, Maj. Kunzi, disclosed a grand jury memoranda to Lt. Col. Phillips in violation of the Rule 6(e) order permitting disclosure only to Army attorneys. Markwood also believes that the Department of Justice's decision not to seek immunity for him demonstrates that the government's only purpose in issuing the CID was to generate a record of his invocation of his Fifth Amendment privilege. Markwood concludes that the district court failed to conduct a *de novo* hearing on the enforcement of the CID. He argues that "[b]ecause the court erred in considering the evidence, failed to inquire, and deprived Appellant of the right to do so [by limiting discovery], the impact of Lt. Col. Phillips' conflict of interest on the CID is still unknown."

These allegations are meritless. Markwood does not assert, as *LaSalle Bank* requires, that any improper motive on Lt.

Col. Phillips's part was adopted by, and therefore institutionalized by, Acting Assistant Attorney General Gerson when he issued the subpoena. Further, nothing in this record, or in the facts as discussed by the *Witmer II* and *Seitz* courts, show that the Attorney General adopted any alleged improper motive of one of its line attorneys. Therefore, Markwood has failed to make the requisite allegation or showing of institutionalized bad faith.

Furthermore, we do not believe that Lt. Col. Phillips had a conflict of interest. To show that Lt. Col. Phillips had a conflict of interest, Markwood offers two criteria for this Court to use to determine whether a conflict of interest exists. The first criterion concerns the ability of government attorneys to obtain information from one investigation for use in another. Relying upon dictum from a Ninth Circuit case, Markwood contends that it is impermissible for "government attorneys who are specially assigned to matters affecting their own agencies [to be in a situation] ... where there is the temptation for the specially appointed attorney 'to obtain documentary access to information useful in the underlying civil litigation.'" Appellant's Brief at 32–33 (citing *FTC v. American Nat'l Cellular*, 868 F.2d 315, 319 (9th Cir.1989)).[17]

Markwood's second criterion would require this Court to find a conflict of interest where an attorney's interest in continued employment and advancement with one agency is dependent upon his or her performance as an investigator with another agency. Markwood argues that "numerous courts have found a conflict of interest to exist where the government attorney remains dependent on the interested agency for salary or career advancement." Markwood cites only two cases for this proposition, one of which is *In re April 1977 Grand Jury Subpoenas*, 573

F.2d 936, 939, 941 (6th Cir.1978). However, the panel decision in *In re April 1977 Grand Jury Subpoenas* was vacated and the case reheard *en banc*. 584 F.2d 1366 (6th Cir. 1978) (en banc), *cert. denied*, 440 U.S. 934, 99 S.Ct. 1277, 59 L.Ed.2d 492 (1979). On rehearing, it was noted that "if in fact a prosecutorial conflict of interest constituting abuse of the grand jury process were shown ... this court could properly consider the case...." *Id.* at 1371 (Edwards and Lively, JJ., concurring). But because "there is no inherent conflict of interest" in the appointment of an Internal Revenue Service attorney who investigated a civil tax matter to assist in or conduct a criminal tax investigation of the same matter, 584 F.2d at 1371, the concurring members of the Court believed that we did not have jurisdiction to review the conflict issue under the All Writs Statute, 28 U.S.C. § 1651 (1970).

To date this Court has not faced the precise question presented here, namely, what criteria should determine when an agency attorney, involved in a civil investigation by that agency, has a conflict of interest because of his or her work on a civil investigation involving the same facts with another agency. The district court rejected Markwood's argument, reasoning that an agency attorney working for another agency of the federal government is working for "a single client—the United States" (quoting *In re April 1977 Grand Jury Subpoenas*, 584 F.2d at 1372); *see also Seitz*, 1993 WL 501817, at *11 ("Lt. Col. Phillips is representing the United States of America"). The district court further observed that, not only does Phillips have as a single client the United States, but the same agency in both investigations—the United States Army.

■ While we agree that a government attorney working on a civil matter who has

---

17. *American Nat'l Cellular* involved the appointment of Federal Trade Commission attorneys, who had obtained a civil injunction against the target of a deceptive practices investigation and later served as special prosecutors in a related criminal contempt action. The Ninth Circuit held that the FTC attorneys did not have a conflict of interest, not because they worked for a single interest—the public interest—in both roles, 868 F.2d at 318, but because: 1) under the

principles of *Young v. United States*, 481 U.S. 787, 107 S.Ct. 2124, 95 L.Ed.2d 740 (1987), the control retained by the United States Attorney over prosecutorial decisionmaking ameliorated any appearance of impropriety; and 2) the extent of the agency attorneys' involvement in the underlying civil litigation was not sufficient to compromise the principles of prosecutorial impartiality as well as the appearance of propriety. 868 F.2d at 320.

been involved in a prior civil investigation with another agency concerning the same facts is working for the same client, the United States, that government attorney is not automatically insulated from having a conflict of interest even though he or she is working on civil matters only. *American Nat'l Cellular,* 868 F.2d at 319. Some cases may present facts where the nature of the civil matter under investigation, or the parties involved, or some other factor requires that a government attorney involved in a related matter not participate in the second civil investigation. Here, however, Markwood's conflict of interest argument is based on the fact of dual representation alone. That "dual representation" alone does not create a conflict. *United States v. Birdman,* 602 F.2d 547, 561–63 (3d Cir.1979) (citations omitted), *cert. denied,* 444 U.S. 1032, 100 S.Ct. 703, 62 L.Ed.2d 668 (1980).

▮▮▮▮ Lt. Col. Phillips was not involved in the litigation before the Armed Services Board of Contract Appeals prior to being assigned to the Department of Justice and the extent of Lt. Col. Phillips's involvement in the Army's investigation has been to help the Army determine whether to move to reopen the Armed Services Board of Contract Appeals proceedings for reconsideration of Arveco's price adjustment claim. *Witmer II,* 835 F.Supp. at 214. Further, when Lt. Col. Phillips came to the Department of Justice, he arrived after it had started investigating Arveco, and did not work on the Arveco matter until five months after his assignment began. We agree with *Witmer II* that Lt. Col. Phillips's slight involvement in the Army's investigation does not create a conflict of interest. In fact, we consider it appropriate for the United States to utilize in one civil proceeding the knowledge and expertise gained by its attorneys in another proceeding, absent circumstances showing

that the information is being used for harassment, bad faith, or in violation of law.

Markwood has shown that Lt. Col. Phillips's involvement in the first civil investigation was negligible, and that his "conflict of interest" arises only from his "dual representation" status. We agree with the district court that Lt. Col. Phillips did not have a conflict of interest and did not act improperly. Even if we thought he had an improper motive or a conflict of interest, on the facts asserted here, the Department of Justice did not issue the CID to Markwood because of Lt. Col. Phillips's motives.

▮▮▮▮ Markwood also contends that the Department of Justice's failure to seek immunity for him illustrates that it had an improper purpose in issuing the CID. He specifically alleges that the Department of Justice wanted to create a record of his invoking his Fifth Amendment privilege against self-incrimination. However, Section 3733(h)(7)(B) merely allows, and does not require, the government to grant immunity to any person refusing to give testimony on grounds of self-incrimination. Further, Markwood's assertion that the government knew, prior to deposing him, that he was going to refuse to answer questions on Fifth Amendment grounds is pure speculation. *See also Seitz,* 1993 WL 501817, at *5 (discussing reasons why this assertion is meritless).

▮▮▮▮ Markwood's final assertion is that the district court failed to conduct a *de novo* inquiry [18] on the summary enforcement petition and failed to consider the evidence of impropriety. This argument is also groundless. Essentially, Markwood is claiming that the district court acted as a "rubber stamp" in granting the United States' petition. However, it is clear that the district court did not act as a "rubber stamp" for the Depart-

18. Citing H.R. Rep. 94–1343, *reprinted in* 1976 U.S.C.C.A.N. at 2608 (discussing enforcement of the antitrust CID) ("After a *de novo* hearing on the nature of the investigation and all the objections to the CID....."). The House has used *de novo* here in an imprecise way to describe the function of a district court in reviewing administrative subpoenas. *"De novo"* is a standard of review which a district court uses, if required by statute or case law, to review administrative de-

terminations of law. In issuing a CID, the Department of Justice is not making a formal determination of law, but must comply with the law in issuing the CID. The district court, as we have said, must make its own determination as to whether the Department of Justice has complied with the CID statute and the judicially-created standards for obtaining enforcement of its subpoena.

ment of Justice. As Markwood points out, in addition to discussing the requirements of Section 3733, the district court discussed and applied the proper body of law to this case, the law regarding the enforcement of administrative subpoenas, and after an extensive discussion of the arguments Markwood raised against enforcement, determined that Markwood had not shown an abuse of the court's process. We believe the district court did not err in deciding to grant the petition.

Therefore, we **AFFIRM** the decision of the district court.