Arthur CUTSHALL, Plaintiff–
Appellee, Cross–Appellant,

v.

Don SUNDQUIST, Govenor of the
State of Tennessee, Defendant–
Appellant, Cross–Appellee.

Nos. 97–6276, 97–6321.

United States Court of Appeals,
Sixth Circuit.

Argued Nov. 5, 1998.

Decided Oct. 4, 1999.

Albert L. Partee III (argued and briefed), OFFICE OF THE ATTORNEY GENERAL, CRIMINAL JUSTICE DIVISION, Nashville, Tennessee, for Appellant.

Gregory Mitchell (argued and briefed), DORAMUS, TRAUGER & NEY, Nashville, Tennessee, for Appellee.

Before: JONES, RYAN, and BATCHELDER, Circuit Judges.

RYAN, J., delivered the opinion of the court, in which BATCHELDER, J., joined. JONES, J. (pp. 483–85), delivered a separate dissenting opinion.

## OPINION

RYAN, Circuit Judge.

The plaintiff, Arthur Cutshall, challenges the constitutionality of the Tennessee Sex Offender Registration and Monitoring Act. TENN.CODE §§ 40–39–101 to –108 (1994). The Act requires sex offenders to register with law enforcement agencies, and allows law enforcement officials to release registry information when necessary to protect the public. Cutshall is subject to the Act because of a 1990 Tennessee conviction for aggravated sexual battery. He challenges both the registration and the notification aspects of the law. While the district court concluded that the registration provision of the Act does not violate the United States Constitution, it agreed with Cutshall that any release of registry information would violate his constitutional rights unless he is given notice and an opportunity to be heard. Therefore, the court granted summary judgment in part for the defendant and in part for the plaintiff. Both sides appealed.

We are asked to decide whether the Act violates the United States Constitution, specifically, the Double Jeopardy, *Ex Post Facto*, Bill of Attainder, Due Process, or Equal Protection Clauses; the Eighth Amendment; the constitutional right to travel interstate; and the constitutional right to privacy. We must also decide whether the Act violates the plaintiff's right to privacy under the Tennessee state constitution. We will reverse in part and affirm in part.

I.

In 1994, Congress enacted, and the President signed into law, the Jacob Wetterling Crimes Against Children and Sexually Violent Offender Registration Program. 42 U.S.C. § 14071. Under this legislation, the Attorney General of the United States was required to establish guidelines for state programs requiring persons convicted of crimes against minors or crimes of sexual violence to register a current address with state law enforcement officials. 42 U.S.C. § 14071(a)(1)(A). The federal law provides:

> The information collected under a State registration program shall be treated as private data except that—
>
> (1) such information may be disclosed to law enforcement agencies for law enforcement purposes;
>
> (2) such information may be disclosed to government agencies conducting confidential background checks; and
>
> (3) the designated State law enforcement agency and any local law enforcement agency authorized by the State agency *may release relevant information that is necessary to protect the public concerning a specific person required to register under this section*, except that the identity of a victim of an offense that requires registration under this section shall not be released.

42 U.S.C. § 14071(d) (1994) (emphasis added). Under the federal law, the states were given three years from September 1, 1994, within which to comply. *See* 42 U.S.C. § 14071(f)(1) (1994). Failure to implement a registration program would result in the loss of some federal funding. *See* 42 U.S.C. § 14071(f)(2)(A) (1994).

Congress amended the federal law in 1996 to provide that the registry information *may* be disclosed for any permissible state law purpose, and that information *shall* be released when necessary to protect the public. Further, the reference indicating that registry information was considered private was removed. *See* 42 U.S.C. § 14071(d) (amended 1996).

In 1994, the Tennessee legislature adopted its own Sexual Offender Registration and Monitoring Act. TENN.CODE § 40–39–101 to –108. Although the Act has been amended since the inception of this lawsuit, the 1994 enactment provided for registration with the Tennessee Bureau of Investigation (TBI) as follows:

> Within ten (10) days following release on probation, parole, or any other alternative to incarceration; within ten (10) days following discharge from incarceration without supervision; within ten (10) days following any change of residence; and within ten (10) days after coming into a municipality or county in which the sexual offender temporarily resides or is domiciled for such length of time; each sexual offender shall complete a TBI sexual offender registration/monitoring form and shall cause such form to be delivered to TBI headquarters in Nashville. Sexual offender registration/monitoring forms shall require disclosure of the following information:
>
> (1) Complete name as well as any alias;
>
> (2) Date and place of birth;
>
> (3) Social security number;
>
> (4) State of issuance and identification number of any valid driver license;

> (5) For a sexual offender on supervised release, the name, address, and telephone number of the registrant's parole officer, probation officer, or other person responsible for the registrant's supervision;
>
> (6) Sexual offense or offenses of which the registrant has been convicted;
>
> (7) Current place and length of employment;
>
> (8) Current address and length of residence at such address; and
>
> (9) Such other registration and/or monitoring information as may be required by rules promulgated by the TBI in accordance with the provisions of the Uniform Administrative Procedures Act, compiled in title 4, chapter 5.

TENN.CODE § 40–39–103 (1994).

The Act also provided for the maintenance of a registry and for the release of registry information:

> (a) Using information received or collected pursuant to this chapter, the TBI shall establish, maintain, and update a centralized record system of sexual offender registration and verification information. The TBI shall promptly report current sexual offender registration and verification information to:
>
> (1) The local law enforcement agency for the offender's place of residence;
>
> (2) The local law enforcement agency for the offender's previous place of residence if a change of residence is indicated;
>
> (3) The local law enforcement agency for the offender's place of employment;
>
> (4) The local law enforcement agency for the offender's previous place of employment if a change of employment is indicated;
>
> (5) When applicable, the probation officer, parole officer, or other public officer or employee assigned responsibility for the offender's supervised release; and
>
> (6) The identification division of the federal bureau of investigation.

(b) Upon request of the TBI, a local law enforcement agency, probation officer, parole officer, or other public officer or employee assigned responsibility for the offender's supervised release, shall assist in the investigation and apprehension of a sexual offender suspected of violating the provisions of this chapter.

(c) Except as otherwise provided in subsections (a) and (b), information reported on sexual offender registration/monitoring forms, verification/monitoring forms, and acknowledgment forms shall be confidential; provided, that *the TBI or a local law enforcement agency may release relevant information deemed necessary to protect the public concerning a specific sexual offender who is required to register pursuant to this chapter.*

TENN.CODE. § 40–39–106 (1994) (emphasis added).

## II.

We review a district court's grant of summary judgment de novo. See *Northeast Ohio Coalition for the Homeless v. City of Cleveland*, 105 F.3d 1107, 1109 (6th Cir.), *cert. denied*, —— U.S. ——, 118 S.Ct. 335, 139 L.Ed.2d 260 (1997).

## III.

### A.

Before we reach the merits of the parties' arguments, we must address the state's contention that the district court lacked subject-matter jurisdiction. Tennessee claims that, as to the notification provision of the Act, there is no case or controversy as required by Article III of the United States Constitution. Specifically, the state claims that Cutshall has failed to allege any imminent threat of harm because there is no evidence that the state is likely to disclose his sex offender registry information to the public. Relatedly, the state argues that Cutshall lacks standing because his claim of injury is mere speculation. Finally, the state claims that the injuries Cutshall alleges stem from the potential misuse of registry information by the public, and cannot be traced to the state.

■ We do not agree.

The irreducible constitutional minimum of standing contains three requirements. First, and foremost, there must be alleged (and ultimately proven) an injury in fact—a harm suffered by the plaintiff that is concrete and actual or imminent, not conjectural or hypothetical. Second, there must be causation—a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant. And third, there must be redressability—a likelihood that the requested relief will redress the alleged injury. This triad of injury in fact, causation, and redressability comprises the core of Article III's case-or-controversy requirement, and the party invoking federal jurisdiction bears the burden of establishing its existence.

*Steel Company v. Citizens for a Better Env't*, 523 U.S. 83, 118 S.Ct. 1003, 1016–17, 140 L.Ed.2d 210 (1998) (internal quotation marks, citations, and footnote omitted.)

■ Beginning with the third element, it is clear, and the parties do not dispute, that the relief sought will redress Cutshall's alleged injuries. Should this court agree with Cutshall's claims, we have the power to grant relief that would prevent the state from disclosing his registry information entirely, thus eliminating his alleged injury.

Turning to the second element, Cutshall has also satisfied this court that the alleged injuries are traceable to the state of Tennessee. To satisfy this requirement, Cutshall need not have a valid claim, only an arguable one. "[T]he absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction." *Id.* at 1010. Cutshall has argued, *inter alia*, that releasing the registry information operates as an impermissible

imposition of punishment. Because it is the state that controls the release of the information, the alleged injuries are causally connected to the state's conduct. We need not agree, as a threshold matter, that the Act imposes a punishment. For Article III purposes, we need only determine that Cutshall has an arguable claim of injuries traceable to the state. We think he has just such a claim.

The first element for standing requires injury in fact, and the state claims that without any clear indication that Cutshall's registry information is about to be released, he has suffered no such injury. However, the statute is written in such a manner that the release of registry information can take place at any time law enforcement officials have determined that release is necessary to protect the public. Therefore, we think Cutshall has satisfied this requirement as well. Were it otherwise, a convicted sex offender would be required to wait until after his registry information is released before challenging the Act. Cutshall's status as a convicted sex offender registered in accordance with the Act arguably results in an injury because he faces a specific threat of being subject to the release of registry information every day. Cutshall's claims are more than general complaints about the conduct of the Tennessee government. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 112, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983).

Therefore, we conclude Cutshall has met the minimum standing requirements to satisfy Article III of the Constitution.

## B.

We turn now to the constitutionality of the Act.

### 1.

#### a.

Cutshall argues that the Act punishes him twice for the same offense, in violation of the Double Jeopardy Clause of the Fifth Amendment to the United States Constitu-

tion. He argues that the Tennessee legislature's purpose in enacting the law was to punish convicted sex offenders and that the Act effectively does so.

First, Cutshall points out that in discussing the Act, some members of the Tennessee legislature made comments indicating that the purpose of the Act was to punish and deter sex offenders and to discourage them from residing in Tennessee. Cutshall argues that lifelong monitoring is a form of punishment. Moreover, he argues, placement of the Act in the Tennessee Criminal Code indicates its punitive nature. Cutshall claims that requiring all sex offenders to register for a period of 10 years is arbitrary, capricious, and excessive, further indicating that the legislation is not a valid regulatory or remedial measure. Cutshall claims that the Tennessee legislature passed the Act in order to punish, and that this intent should end the inquiry.

Second, Cutshall argues that the Act has punitive effects. He claims the Act imposes an affirmative disability on all sex offenders because they must continually update their registry information and respond to requests for information from the TBI under penalty of law.

Cutshall also argues that any release of registry information imposes a punishment. He claims that public disclosure does not serve the state's alleged purpose of aiding law enforcement. According to Cutshall, public disclosure subjects sex offenders to stigmatization, ridicule, and harassment. He submits that the shaming effect of public disclosure has traditionally been viewed as punishment.

The state of Tennessee, on the other hand, claims that the legislature promulgated the Act to assist law enforcement in solving crimes and to help the public protect itself. Moreover, the state claims that Tennessee passed the law in response to an act of the United States Congress which required the several states to establish sex offender registries or lose certain

federal funding. The state submits that the Act does not operate to punish registrants because it in no way seeks to limit their actions, and registering requires little effort and inconvenience.

### b.

The Double Jeopardy Clause of the Fifth Amendment provides in relevant part, "nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. The Fifth Amendment applies to the states through the Fourteenth Amendment. *See Benton v. Maryland*, 395 U.S. 784, 794–95, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969).

> [T]he Double Jeopardy Clause does not prohibit the imposition of *any* additional sanction that could, in common parlance, be described as punishment. The Clause protects only against the imposition of multiple *criminal* punishments for the same offense, ... and then only when such occurs in successive proceedings.

*Hudson v. United States*, 522 U.S. 93, 118 S.Ct. 488, 493 (1997) (some emphasis added) (internal quotation marks and citations omitted).

■ In *Hudson*, the most recent Supreme Court decision addressing whether a statutory scheme imposes punishment for double jeopardy purposes, the Court advanced a two-part inquiry:

> A court must first ask whether the legislature, in establishing the penalizing mechanism, indicated either expressly or impliedly a preference for one label or the other. Even in those cases where the legislature has indicated an intention to establish a civil penalty, we have inquired further whether the statutory scheme was so punitive either in purpose or effect ... as to transfor[m] what was clearly intended as a civil remedy into a criminal penalty.

*Id.* (internal quotation marks and citations omitted).

■ In evaluating the second part of this analysis, the Court counseled in favor of the factors previously articulated in *Kennedy v. Mendoza–Martinez*, 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963):

> [(1) w]hether the sanction involves an affirmative disability or restraint, [(2)] whether it has historically been regarded as a punishment, [(3)] whether it comes into play only on a finding of scienter, [(4)] whether its operation will promote the traditional aims of punishment—retribution and deterrence, [(5)] whether the behavior to which it applies is already a crime, [(6)] whether an alternative purpose to which it may rationally be connected is assignable for it, [and (7)] whether it appears excessive in relation to the alternative purpose assigned.... [It is important to note, however, that] these factors must be considered in relation to the statute on its face.

*Id.* at 168–69, 83 S.Ct. 554 (internal quotation marks, citations, and footnotes omitted).

In *Hudson*, the Supreme Court retreated somewhat from its decision in *United States v. Halper*, 490 U.S. 435, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989), abrogated by *Hudson v. United States*, 522 U.S. 93, 118 S.Ct. 488, 139 L.Ed.2d 450, in favor of its earlier decision in *United States v. Ward*, 448 U.S. 242, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980). According to the *Hudson* Court, *Halper* improperly skipped the first step in the analysis, and focused on whether the sanction was so grossly disproportionate to the harm caused so as to constitute punishment. *Hudson*, 118 S.Ct. at 494. Also, *Halper* failed to recognize that all civil penalties serve as a deterrent. *See id.* In backing away from *Halper*, the Court voiced a concern "about the wide variety of novel double jeopardy claims spawned in the wake of Halper," including *E.B. v. Verniero*, 119 F.3d 1077 (3d Cir. 1997), *cert. denied*, 118 S.Ct. 1039 (1998), a challenge to New Jersey's sex offender

registration law as violative of double jeopardy. *Hudson*, 118 S.Ct. at 493 & n. 4.

**c.**

■ We begin by examining the Act's purpose. The Act has been amended since the inception of this lawsuit, but as enacted, it contained no express statement of purpose. Although it is placed in title 40 of the Tennessee Code, the section devoted to criminal procedure, its location within criminal procedure laws does not necessarily indicate an intent on the part of the legislature to punish sex offenders. The Supreme Court has repeatedly approved of civil forfeitures after criminal prosecutions, even when the statute authorizing forfeiture is located in the same statute as the criminal offense. *See, e.g., United States v. One Assortment of 89 Firearms*, 465 U.S. 354, 104 S.Ct. 1099, 79 L.Ed.2d 361 (1984). We think the location of Tennessee's sex offender law does not assist us in determining whether the Act was intended to serve as punishment.

In examining the purpose of the statute, we look primarily to its language. As enacted, it contained six substantive sections, dealing with the content of registry information, verification of registry information, formalities of registry forms, record keeping and reporting of registry information, potential for removal from the registry, and penalties for violating the registration requirements. Noticeably absent in this statutory scheme is an indication that the legislature intended for the Act to have other than a regulatory purpose. The reporting provisions themselves merely require registrants to supply basic information; the burdens imposed are minor, involving only the completion of the appropriate forms. The language of the Act evidences an intent on the part of the legislature to monitor the whereabouts of convicted sex offenders. Moreover, the authority of law enforcement agencies to disclose registry information is limited to situations in which disclosure is necessary to protect the public. This, we think, is further indication that the legislature did not intend for the Act to be punitive. In sum, we find no indication that the Tennessee legislature intended the Act to be a punitive measure.

Finding no punitive purpose evident from the language of the Act, we are required nevertheless to determine whether, in its effect, the Act is punitive in the sense that it twice punishes a registrant for the same offense. In examining the effects of the law, the factors articulated by the Supreme Court in *Kennedy*, 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644, we discussed earlier, "provide useful guideposts." *Hudson*, 118 S.Ct. at 493. However, these factors must be considered in light of the statute on its face, and "only the clearest proof will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty." *Id.* (internal quotation marks and citation omitted).

The first *Kennedy* factor, an affirmative disability or restraint, "is some sanction approaching the infamous punishment of imprisonment." *Herbert v. Billy*, 160 F.3d 1131, 1137 (6th Cir.1998) (internal quotation marks and citations omitted). In *Hudson*, the Supreme Court concluded that indefinite debarment from the banking industry did not rise to an affirmative disability or restraint. *Hudson*, 118 S.Ct. at 496. This court, in *Herbert*, concluded that driver's license suspension for driving under the influence did not impose an affirmative disability. *Herbert*, 160 F.3d at 1137. Similarly, the Tennessee Act does not impose an affirmative disability or restraint. In fact, the burdens imposed on sex offenders are less onerous than those imposed in *Hudson* and *Herbert*, loss of livelihood and loss of driver's license. Cutshall need only notify the TBI where he lives, where he works, and other basic data. He is free to live where he chooses, come and go as he pleases, and seek any employment he wishes. Neither are the public notification provisions tantamount to imprisonment. Under the Act, law en-

forcement officials may disclose registry information when necessary to protect the public. This imposes no restraint whatever upon the activities of a registrant.

The second *Kennedy* factor asks whether, from a historical perspective, the sanction has been viewed as punishment. Historically, punishment has taken the forms of incarceration, incapacitation, and rehabilitation. Nothing in the Tennessee Act imposes restrictions on the conduct of sex offenders that are akin to incarceration or incapacitation; nor does the Act force registrants to conform their actions in the way that rehabilitative efforts might. The Act keeps law enforcement officials informed of the location of convicted sex offenders, and, when necessary, the public can be notified of sex offenders who pose a particular risk. The focus of the Act is not on circumscribing the conduct of the offender, but on the protection of the public. The Act provides for the collection and dissemination of information; Cutshall has not cited, and we have not found, any evidence that dissemination of information has historically been considered punishment. We are mindful of the fact that shaming punishments, such as banishment and pillory, have historically been used to punish criminals. However, these practices involved more than the mere dissemination of information. Moreover, the possibility of a shaming effect from disclosure of registry information is certainly not the clearest of proof necessary to overcome the legislative intent that the Act serve regulatory and not punitive purposes. Dissemination of information is fundamentally different from traditional forms of punishment, and we conclude that it has not been viewed as punishment from a historical perspective.

The third factor requires that we consider whether the Act is triggered only upon a finding of scienter. "The term 'scienter' means 'knowingly' and is used to signify a defendant's guilty knowledge." *Herbert*, 160 F.3d at 1137–38. The Supreme Court concluded, in *Hudson*, that the law authorizing debarment from the banking industry did not come into play "only" upon a finding of scienter where the law applied to "any person 'who violates' any of the underlying banking statutes, without regard to the violator's state of mind." *Hudson*, 118 S.Ct. at 496. The Court did not specifically examine the state of mind requirements of the underlying banking statutes, and instead looked to the debarment statute "on its face." *Id.* Similar to the debarment statute in *Hudson*, the Tennessee Act applies to persons convicted of any one of the sex offenses listed in the statute, without inquiry into the offender's state of mind. Although it is not clear that we are required to examine the state of mind requirements of the underlying sexual offenses, an examination of the offenses leads to the same conclusion. Some of the listed offenses do not clearly specify a culpable *mens rea*. *See, e.g.*, TENN.CODE § 39–13–506 (statutory rape). The Tennessee Code specifies, and Tennessee courts have held, that "when a statute omits reference to a specific *mens rea*, but does not plainly dispense with a *mens rea* requirement, then proof of 'intent,' 'knowledge,' or 'recklessness' will suffice to establish a culpable mental state." *State v. Hill*, 954 S.W.2d 725, 726 (Tenn.1997) (citing TENN.CODE § 39–11–301(c)). Thus, in view of the language of the Act and the relevant underlying offenses, we conclude that the Act does not come into play "only" on a finding of scienter.

In examining the fourth *Kennedy* factor, it is clear that the Act will serve to promote deterrence. Certainly, once a sex offender has informed the local law enforcement agency of his address and place of employment, knowing that law enforcement officials have that information will likely operate as a deterrent. However, the Supreme Court in *Hudson*, cautioned: "To hold that the mere presence of a deterrent purpose renders ... sanctions 'criminal' for double jeopardy purposes would severely undermine the Government's ability to engage in effective regulation...." *Hudson*, 118 S.Ct. at 496.

Thus, satisfaction of this factor is not dispositive, but it does weigh in Cutshall's favor.

The fifth *Kennedy* factor asks whether the behavior to which the statute applies is already a crime. The Act unarguably applies only to convicted sex offenders. In *Herbert*, this court addressed an Ohio law authorizing license suspension for driving under the influence, a sanction imposed in addition to criminal prosecution for drunk driving. The court recognized that the "statutory scheme ... intertwine[d] the license suspension with the arrest for drunken driving," but concluded that this was insufficient to find license suspension punitive for double jeopardy purposes. *Herbert*, 160 F.3d at 1138. Similarly, although the registration and notification provisions are intertwined with the offender's underlying conviction, they impose no additional penalty akin to revocation of license or loss of livelihood. We decline to hold that these requirements transform the Act from one that is regulatory to one that is punitive.

The final two factors under the *Kennedy* analysis require us to decide whether there is a remedial purpose behind the Act and if so, whether the Act is excessive in relation to the remedial purpose. As we have said, the Act serves to aid law enforcement and protect the public. Congress, and the legislatures of the several states, have considered the egregiousness of sexual crimes, particularly where children are concerned, and studies have indicated that sexual offenders have high rates of recidivism. We are also mindful of the burdens the Act imposes on convicted sex offenders. However, many of these alleged burdens stem not from the Act itself, but from the potential abuse of registry information by the public. Given the gravity of the state's interest in protecting the public from recidivist sex offenders, and the small burdens imposed on registrants, we cannot say that the requirements of the Act exceed its remedial purpose.

The state of Tennessee has alerted us to the purpose statement adopted by the Tennessee legislature in 1997, after the commencement of this litigation. *See* TENN.CODE § 40–39–101 (1997). It is not impossible that this purpose clause was a *post hoc* effort to clarify the legislature's intent in enacting the original statute. As a result, we will disregard this purpose statement entirely.

Examining the statute in light of each of the *Kennedy* factors, we conclude that the Act does not violate the prohibition against double jeopardy.

2.

■ Cutshall also argues that the Act violates the *Ex Post Facto* Clause of the federal Constitution. The clause provides: "No state shall ... pass any ... ex post facto Law." U.S. CONST. art. I, § 10, cl. 1. "To fall within the *ex post facto* prohibition, a law must be retrospective—that is it must apply to events occurring before its enactment—and it must disadvantage the offender affected by it by altering the definition of criminal conduct or increasing the punishment for the crime." *Lynce v. Mathis*, 519 U.S. 433, 441, 117 S.Ct. 891, 137 L.Ed.2d 63 (1997) (internal quotation marks and citation omitted). The clause is designed to protect against legislative abuses and to provide fair notice of the consequences of criminal actions. *See Miller v. Florida*, 482 U.S. 423, 429–30, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987).

■ The parties do not dispute that the Act was passed after Cutshall committed his sexual offense. They also agree that the Act purports to apply to those convicted of sex offenses prior to its enactment. Therefore, we need only address the second element of the *ex post facto* analysis: whether the Act impermissibly disadvantages sex offenders, by altering the definition of criminal conduct or increasing the onerousness of the punishment for crimes committed before their enactment.

The Supreme Court, although not expressly adopting the *Kennedy* factors, recently applied many of the same factors in deciding an *ex post facto* challenge in another context. *See Kansas v. Hendricks*, 521 U.S. 346, 360–69, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997). *Hendricks* involved a constitutional challenge to a civil commitment statute, Kansas's Sexually Violent Predator Act. *See id.* at 2076. The Court conducted a single analysis, determined that the law at issue was not punitive, and concluded that the law could not violate either the double jeopardy prohibition or the ban on *ex post facto* laws. *See id.* at 2081–85.

In light of the analysis in *Hendricks*, we are persuaded that the intent-effects analysis we have discussed in the double jeopardy context applies as well for determining whether the *Ex Post Facto* Clause is implicated by the Act. Using this approach, we conclude, once again, that the Act was not intended to punish, and its requirements do not transform the law into punishment. Because the Act imposes no punishment, the *Ex Post Facto* Clause is not implicated.

### 3.

■ A third challenge Cutshall lodges against the Act is that it violates the constitutional bar against bills of attainder. The Bill of Attainder Clause, U.S. Const. art. I, § 9, cl. 3, prohibits legislatures from engaging in "[l]egislative acts, no matter what their form, that apply either to named individuals or to easily ascertainable members of a group in such a way as to inflict punishment on them without a judicial trial." *United States v. Brown*, 381 U.S. 437, 448–49, 85 S.Ct. 1707, 14 L.Ed.2d 484 (1965). In *Nixon v. Administrator of General Services*, 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977), the Supreme Court considered the definition of punishment in the bill of attainder context. The Court announced a three-prong test for determining whether the law in question imposed a punishment. The Court

considered, first, punishments that historically would have been viewed as violative of the bill of attainder prohibition: "imprisonment, banishment, . . . the punitive confiscation of property by the sovereign," and "a legislative enactment barring designated individuals or groups from participation in specified employments or vocations." *Id.* at 474, 97 S.Ct. 2777 (footnotes omitted). Second, the Court considered whether, in light of the severity of the burdens imposed, the challenged law served legitimate nonpunitive purposes. *See id.* at 475–76, 97 S.Ct. 2777. Third, the Court examined whether the legislature intended the law to serve as punishment. *See id.* at 478, 97 S.Ct. 2777 (citing *Kennedy v. Mendoza–Martinez*, 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644). These three considerations were applied again in *Selective Service System v. Minnesota Public Interest Research Group*, 468 U.S. 841, 852, 104 S.Ct. 3348, 82 L.Ed.2d 632 (1984).

■ It is self-evident, we think, that the Tennessee Act did not, in light of these considerations, violate the Bill of Attainder Clause. Gathering and possibly disseminating information is not one of the traditional forms of punishment. And, as we have made clear, the Act serves legitimate regulatory purposes and was not intended to serve as punishment.

### 4.

■ Cutshall argues that the Act violates the Eighth Amendment's prohibition of cruel and unusual punishment. The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.

We have already concluded that the Act does not impose punishment; it is regulatory in nature. Therefore, it does not violate the Eighth Amendment's prohibition on cruel and unusual punishment.

**5.**

■ Cutshall also claims the Act violates his constitutional right to interstate travel. He bases this argument on statements in the legislative history of the Act indicating that a sex offender registry would encourage sex offenders to flee Tennessee in search of states with no such registry.

This argument must fail. "The cases applying the right to travel doctrine involve laws which distinguished between newcomers to a state, who were denied fundamental rights, and residents of longer duration, who were accorded such rights." *Salibra v. Supreme Court of Ohio*, 730 F.2d 1059, 1064–65 (6th Cir. 1984). The Tennessee Act applies to all sex offenders residing in Tennessee regardless of where they were convicted. The Act contains no duration of residency restriction. Moreover, now that all 50 states have adopted sex offender registries, *see* Stacey Hiller, Note, *The Problem with Juvenile Sex Offender Registration: The Detrimental Effects of Public Disclosure*, 7 B.U. PUB. INT. L.J. 271, 276 & n. 36 (1998), Tennessee is no more or less attractive than any other state for a sex offender seeking a place to reside in total anonymity.

**6.**

Cutshall also challenges the Act on procedural due process grounds. He claims the Act deprives him of alleged constitutional rights of privacy and employment, and the right to be free from stigma, without due process of law. Specifically, Cutshall claims that the Act infringes his protected liberty interests because it imposes punishment, subjects him to stigmatization and loss of employment, infringes his right to pursue employment, and violates his state and federal right to privacy by disclosing private matters.

The district court agreed with Cutshall that the provision of the Act allowing for *public disclosure* of registry information violated these rights, and concluded that Tennessee was required to provide Cutshall with appropriate procedural due process protections before releasing any registry information. On the other hand, the district court concluded that no constitutionally protected interest was implicated by the *registration provision.*

"The Fourteenth Amendment prohibits state actors from depriving an individual of life, liberty, or property without due process of law." *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 140–41 (6th Cir. 1997). Absent state interference with a protected property or liberty interest, Cutshall is entitled to no pre-deprivation process whatsoever. *See id.* at 141.

[A] property interest exists and its boundaries are defined by "rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."

*Id.* (quoting *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)). Therefore, to establish a protected interest in either freedom from having to register or freedom from public disclosure of registry information, Cutshall must be able to point to a right conferred by state law or the Constitution that supports his contention.

■ We will address each of Cutshall's arguments in turn. First, "[i]t is fundamental that the state cannot hold and physically punish an individual except in accordance with due process of law." *Ingraham v. Wright*, 430 U.S. 651, 674, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977). However, the Tennessee Act involves no physical restraint, and we have concluded that it imposes no punishment. Therefore, we reject Cutshall's first due process argument and hold that the Act does not implicate Cutshall's liberty interest in being free from punishment without due process of law.

■ Cutshall's claim that the Act violates his Fourteenth Amendment rights because it imposes a stigma and deprives him of employment and privacy is likewise without merit. In *Wisconsin v. Constantineau*, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971), the Supreme Court addressed the constitutionality of a Wisconsin law authorizing the posting of names of individuals to whom intoxicating liquors should not be sold. The Court stated: "Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." *Id.* at 437, 91 S.Ct. 507. The Supreme Court made clear in a later case, however, that reputation alone is not a constitutionally protected liberty or property interest. *See Paul v. Davis*, 424 U.S. 693, 701, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). Only where the stigma of damage to a reputation is coupled with another interest, such as employment, is procedural due process protection triggered. In reviewing its decisions, the Supreme Court stated that "the Court has never held that the mere defamation of an individual, whether by branding him disloyal or otherwise, was sufficient to invoke the guarantees of procedural due process absent an accompanying loss of government employment." *Id.* at 706, 96 S.Ct. 1155 (emphasis added). The Due Process Clause is implicated only when state conduct alters "a right or status previously recognized by state law." *Id.* at 711, 96 S.Ct. 1155. This has come to be known as the "stigma-plus" test. *See, e.g., Levin v. Childers*, 101 F.3d 44, 46 (6th Cir.1996).

■ To succeed in establishing a protected liberty interest, a plaintiff must show that the "governmental action taken ... deprived the individual of a right previously held under state law." *Paul*, 424 U.S. at 708, 96 S.Ct. 1155. In *Naegele Outdoor Advertising Co. v. Moulton*, 773 F.2d 692, 701 (6th Cir.1985), this court observed that loss of government employment, or loss of the right to purchase

alcohol, met the "plus" portion of the stigma-plus test under previous Supreme Court decisions. Cutshall claims that loss of employment and violation of his privacy rights satisfy the "plus" requirement in his case.

■ We examine, first, Cutshall's claim that the Act deprives him of his claimed right to employment. "A charge that merely makes a plaintiff less attractive to other employers but leaves open a definite range of opportunity does not constitute a liberty deprivation." *Gregory v. Hunt*, 24 F.3d 781, 788 (6th Cir.1994) (internal quotation marks and citation omitted). In this case, the Act does not limit the ability of registrants to seek and obtain any type of employment. In *Dean v. McWherter*, 70 F.3d 43 (6th Cir.1995), the plaintiffs challenged a Tennessee law that labeled sex offenders as "mentally ill." The plaintiffs claimed that the law violated the Due Process Clause because it stigmatized them and diminished their future employment opportunities. This court rejected the challenge, noting that the plaintiffs failed to establish that the labeling adversely impacted their employment opportunities. "[P]laintiffs' future employment opportunities depend on independent, medical mental health evaluations and on the willingness of employers to hire convicted sex offenders, not on the [law at issue]." *Id.* at 46.

Courts recognizing a constitutionally protected right to employment have done so in very limited circumstances and have dealt with terminations of government employment where either state law or an agreement between the parties purports to limit the ability of the government to terminate the employment. Cutshall has not cited, and we have not found, any case recognizing a general right to private employment. *Greene v. McElroy*, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959), and *Joelson v. United States*, 86 F.3d 1413 (6th Cir.1996), relied on by the district court, involved government employment and do not support the district court's

conclusion that the Act implicates a constitutionally protected liberty or property interest in employment.

The Act in no way infringes upon Cutshall's ability to seek, obtain, and maintain a job. Cutshall does not contend, quite correctly, that the Act prevents him from obtaining government employment. Therefore, we hold that the Act does not implicate a constitutionally protected liberty or property interest in employment.

We turn now to Cutshall's right to privacy claim under the federal Constitution. In *Whalen v. Roe*, 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977), the Supreme Court acknowledged the existence of a privacy interest in decision making, and the possibility of an individual interest in avoiding disclosure of personal matters. However, to support the existence of a privacy interest in avoiding publication of personal matters, the Court cited only concurring and dissenting opinions. *See Whalen*, 429 U.S. at 599–600 & n. 25, 97 S.Ct. 869. We find no authority in that case for the proposition that such an interest exists. At any rate, the *Whalen* Court concluded that the law at issue, which compiled data on patient prescriptions, did not implicate the alleged privacy interest in avoiding the disclosure of private matters. In the same vein, we are not persuaded that the Act infringes on any constitutionally protected privacy interest.

In *Paul*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405, the Court again addressed the right of privacy:

> While there is no right of privacy found in any specific guarantee of the Constitution, the Court has recognized that zones of privacy may be created by more specific constitutional guarantees and thereby impose limits upon government power.... [P]ersonal rights found in this guarantee of personal privacy must be limited to those which are fundamental or implicit in the concept of ordered liberty.... The activities detailed as being within this definition were ... matters relating to marriage, procreation, contraception, family relationships, and child rearing and education. In these areas it has been held that there are limitations on the States' power to substantively regulate conduct.

*Id.* at 712–13, 96 S.Ct. 1155 (internal quotation marks and citations omitted).

This court addressed a right of privacy claim in *J.P. v. DeSanti*, 653 F.2d 1080 (6th Cir.1981). The case involved a challenge to an Ohio county's practice of compiling social histories on juvenile offenders. The social histories contained information about the incident, the juvenile, his family, school records, and anything else that the probation officer deemed relevant. *See id.* at 1082–83. The social history was given to the court and made "available to 55 different government, social and religious agencies that belong to a 'social services clearinghouse.'" *Id.* at 1082. The juvenile plaintiffs alleged that this practice violated their constitutional right of privacy. *See id.* at 1085. This court rejected the challenge, even in light of the language in *Whalen* indicating the possible existence of a right to nondisclosure of private matters:

> Absent a clear indication from the Supreme Court we will not construe isolated statements in *Whalen* ... more broadly than their context allows to recognize a general constitutional right to have disclosure of private information measured against the need for disclosure....
>
> ....
>
> ... [W]e conclude that the Constitution does not encompass a general right to nondisclosure of private information. We agree with those courts that have restricted the right of privacy to its boundaries as established in *Paul v. Davis* ... and *Roe v. Wade*, 410 U.S. [113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973),] ... those personal rights that can be deemed "fundamental" or "implicit in the concept of ordered liberty."

*Id.* at 1089–90 (citations omitted). This court concluded that release of juvenile

social records did not violate any privacy right that was fundamental or implicit in the concept of ordered liberty. *See id.* at 1090.

In making its decision that Cutshall had a constitutional right to keep his registry information private, the district court relied heavily on *United States Department of Justice v. Reporters Committee for Freedom of the Press*, 489 U.S. 749, 109 S.Ct. 1468, 103 L.Ed.2d 774 (1989). However, a careful analysis leads us to conclude that this case is not applicable to the issue before us. In *Reporters Committee*, the Supreme Court decided "whether the disclosure of the contents of [an FBI rap sheet] to a third party could reasonably be expected to constitute an unwarranted invasion of personal privacy *within the meaning of the Freedom of Information Act.*" *Id.* at 751, 109 S.Ct. 1468 (emphasis added) (internal quotation marks and citation omitted). The Freedom of Information Act, 5 U.S.C. § 552, requires broad disclosure of documents. Records or information compiled for law enforcement are excepted from disclosure, " 'but only to the extent that the production of such [materials] ... could reasonably be expected to constitute an unwarranted invasion of personal privacy.' " *Id.* at 755–56, 109 S.Ct. 1468 (quoting 5 U.S.C. § 522(b)(7)(C)). Although the Court made references to the possibility of a constitutional right to keep private matters from being publicly disclosed, any reference made to this possible right was mere *dicta*. The only matter before the Court was a specific exception to FOIA; and after the *Reporters Committee* decision, this court has continued to maintain its position articulated in *J.P.* that there is no federal constitutional right of nondisclosure. *See Doe v. Wigginton*, 21 F.3d 733, 740 (6th Cir.1994). Therefore, the district court's reliance on *Reporters Committee* was misplaced, and we conclude that Cutshall has no constitutional right to keep his registry information from being disclosed.

Given the Supreme Court's and this court's narrow view of the federal constitutional right of privacy, we reject Cutshall's claim that the Act infringes on this asserted right. The Constitution does not provide Cutshall with a right to keep his registry information private, and the Act does not impose any restrictions on his personal rights that are fundamental or implicit in the concept of ordered liberty, such as his procreative or marital rights.

■ Cutshall also claims a privacy interest derived from Tennessee law. The Supreme Court of Tennessee has concluded:

> Based on both the language and the development of our state constitution, we have no hesitation in drawing the conclusion that there is a right of individual privacy guaranteed under and protected by the liberty clauses of the Tennessee Declaration of Rights.
>
> Undoubtedly, that right to privacy incorporates some of the attributes of the federal constitutional right to privacy and, in any given fact situation, may also share some of its contours.... [H]owever, there is no reason to assume that there is complete congruency.

*Davis v. Davis*, 842 S.W.2d 588, 600 (Tenn.1992). The specific individual freedom at stake in *Davis* was the right of procreation, and the court concluded that it was included in the individual's right of privacy. *See id.*

This court has recently been faced with the claim presented here—that the Tennessee constitution provides a right to be free from the public disclosure of private facts. This court declined to decide the matter out of "respect for the right of a state court system to construe that state's own constitution and ... statute." *Doe v. Sundquist*, 106 F.3d 702, 708 (6th Cir.), *cert. denied*, 522 U.S. 810, 118 S.Ct. 51, 139 L.Ed.2d 16 (1997). That case involved a challenge to the recent legislation in Tennessee significantly broadening the availability of previously sealed adoption records. When the plaintiffs in that case

brought their claims in Tennessee state court seeking injunctive relief, the Tennessee judge stated:

> The Court finds the plaintiffs' argument that the right of privacy extends to nondisclosure of private information to be without merit. The disclosure of private information is not entitled to constitutional protection. The right to privacy has more to do with the general "right to be let alone" and a protected sphere in which the government may not regulate conduct rather than some amorphous right protecting against the nondisclosure of private information.

*Doe v. Sundquist*, No. 97C–941, 1997 WL 354786, at *6 (Tenn.Cir.Ct. May 2, 1997) (emphasis added).

The Tennessee Court of Appeals has observed "that the right to privacy provided to Tennesseans under our Constitution is in fact more extensive than the corresponding right to privacy provided by the Federal Constitution." *Campbell v. Sundquist*, 926 S.W.2d 250, 261 (Tenn.Ct.App. 1996). However, that case dealt with the autonomy branch of privacy and did not address any right of nondisclosure. In that case, the court invalidated a Tennessee law which attempted to restrict consensual homosexual sex:

> We think it is consistent with this State's Constitution and constitutional jurisprudence to hold that an adult's right to engage in consensual and noncommercial sexual activities in the privacy of that adult's home is a matter of intimate personal concern which is at the heart of Tennessee's protection of the right to privacy, and that this right should not be diminished or afforded less constitutional protection when the adults engaging in that private activity are of the same gender.

*Id.* at 262. Cutshall has not cited, and we have not found, any case from a Tennessee court adopting a constitutional right to the nondisclosure of private matters.

The Tennessee Supreme Court has not spoken on the issue of whether the Tennessee constitution provides a right of privacy encompassing a right to the nondisclosure of private matters. We have examined the Tennessee constitution and find no language suggesting a right of privacy of the kind Cutshall claims. Moreover, and what is more important, we have no reason to believe that the Tennessee Supreme Court would find such a right. Therefore, we hold that the Tennessee constitution does not provide a right to the nondisclosure of private facts.

Cutshall has failed to establish that the Act infringes any constitutionally protected liberty or property interests in employment or privacy. Without more, his claim that the Act damages his reputation must also fail. Without the "plus" factor of employment or privacy, Cutshall has failed to satisfy the stigma-plus test of *Paul*. Therefore, he is not entitled to any procedural protections under the Due Process Clause.

### 7.

■ Finally, Cutshall claims that the Act violates the Equal Protection Clause. The Equal Protection Clause provides that "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Unless the legislation classification under attack involves a suspect class, the classification need only be rationally related to a legitimate government goal to survive constitutional challenge. *See Chapman v. United States*, 500 U.S. 453, 465, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991). "'[L]egislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *Cleburne*, 473 U.S. at 440, 105 S.Ct. 3249.

■ Convicted sex offenders are not a suspect class. Therefore, the Act is subject to scrutiny under the rational basis test. Tennessee has established legitimate concerns about law enforcement and public

safety with respect to sex offenses. Given the indications that sex offenders pose a particular threat of reoffending, we cannot say that the Act is irrational. Therefore, this claim must also fail. We hold that the Act does not violate Cutshall's right to equal protection of the laws.

### C.

Tennessee also takes issue with the temporary injunction issued by the district court preventing the state from releasing sex offender registry data. Although not crystal clear from the proceedings below, we will assume, without deciding, that the injunction is still in effect.

 This court reviews the decision to grant a preliminary injunction for an abuse of discretion. *See Glover v. Johnson,* 855 F.2d 277, 282 (6th Cir.1988). In deciding whether a preliminary injunction was an abuse of discretion, this court considers the following four factors:

(a) the likelihood of the success on the merits of the action,

(b) the irreparable harm which could result without the relief requested,

(c) the impact on the public interest, and

(d) the possibility if substantial harm to others.

*Id.* Because, for all the reasons we have discussed at length, Cutshall has failed to persuade this court that his challenge would likely succeed on the merits, we find that the district court abused its discretion in entering the injunction.

### IV.

For all of these reasons, we find that the Act is not unconstitutional either in its registration provision or its notification provision. We **REVERSE** the district court's decision insofar as it found that the state of Tennessee was required to provide sex offenders with a due process hearing prior to releasing registry information. We **AFFIRM** the district court's decision in upholding the registration provision. The injunction entered by the district court is dissolved.

NATHANIEL R. JONES, Circuit Judge, dissenting.

I disagree with the majority's conclusion that Cutshall is not entitled to a due process hearing before public disclosure of his sex offender registration and verification information can occur pursuant to Tenn. Code Ann. 40–39–106(c) and (d) (1994).[1] Like the district court, I believe that Cutshall is entitled to such a hearing. I also take issue with the majority's final resolution of this case. Because the district court elected to review the constitutionality of just one of the claims presented by the parties, multiple constitutional claims remain pending for resolution. I would therefore remand this case for additional findings by the district court. On these two grounds, I am compelled to dissent.

At the outset, let me make clear my intentions in dissenting. In no way should my dissent be read as minimizing the significant social problems we face as a result of the all-too-prevalent sexual offender

---

1. Those provisions provide:

(c) For all offenses committed prior to July 1, 1997, except as otherwise provided in subsections (a) and (b), information reported on sexual offender registration/monitoring forms, verification/monitoring forms, and acknowledgment forms shall be confidential; provided, that the TBI or a local law enforcement agency shall release relevant information deemed necessary to protect the public concerning a specific sexual offender who is required to register pursuant to this chapter.

(d) If the TBI or a local law enforcement agency deems it necessary to protect the public concerning a specific sexual offender who is required to register pursuant to this part, such bureau or agency may notify the public by any means including the following:

(1) Written notice;

(2) Electronic transmission of registration information; or

(3) Providing on-line access to registration information.

Tenn.Code Ann. §§ 40–39–106(c), (d).

crimes which occur. Such crimes, when committed against adults, and especially when committed against children, are an affront to the core values that I hold dear. Without question, sexual offenders and sexual predators present a danger, and must be diligently prosecuted to the fullest extent of the law. *See, e.g.*, Booth Gunter, *Sounding the Alarm on Sexual Predators*, TAMPA TRIBUNE, Mar. 2, 1997, at 1, available in 1997 WL 7037377; Vanessa Ho, *Sexual Predators Ride the Internet into Homes Across America*, SEATTLE POST-INTELLIGENCER, May 6, 1997, at A1, available in 1997 WL 3195702; Tamara Lytle, *Sexual Predators Lurk On-Line*, CHICAGO TRIBUNE, Nov. 8, 1997, at 10, available in 1997 WL 3608086; Jack Sullivan, *Potential for Danger from Sexual Predators is Growing*, BOSTON HERALD, Mar. 13, 1999, at 7, available in 1999 WL 3392637. Today, however, I write not in my role as husband, father and grandfather, but rather, in my role as judge—a role which requires me, when appropriate, to review state criminal statutes to determine whether they pass constitutional muster. A state statute designed to protect the public from criminals and criminal behavior—no matter how vile the crime—must comport with constitutional guarantees.

In my view, the district court correctly found that the guarantees secured by the Fourteenth Amendment's Due Process Clause require, at minimum, that a hearing be held prior to public disclosure of a sex offender's registration and verification information. *See Cutshall v. Sundquist*, 980 F.Supp. 928, 934 (M.D.Tenn.1997); *see also E.B. v. Verniero*, 119 F.3d 1077, 1111 (3d Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 1039 (1998); *Doe v. Pataki*, 3 F.Supp.2d 456, 471 (S.D.N.Y.1998). The need to hold a due process hearing is made more acute by the fact that the Tennessee Act views all sex offenders the same, regardless of the severity of their crime(s). The sex offender statutes enacted in other states, by contrast, distinguish offenders for purposes of public information disclosure, and categorize them by the risk of recidivism (what the statutes call the risk of "re-offense"). *See, e.g.*, N.J. Stat. Ann. § 2C:7–8(c) (West 1995) (commonly known as "Megan's Law"). In the case of offenders who have committed severe sexual crimes, the public is provided a great deal of information, including the offender's name, address and photograph. Where the offender's sexual crime is less severe, the public is provided less information— for example, the offender's zip code, but not his address. *See Doe v. Pataki*, 120 F.3d 1263, 1268–70 (2d Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 1066, 140 L.Ed.2d 126 (1998) (describing N.Y. Correct. Law § 168 *et seq.* (McKinney Supp. 1999)). Because the Tennessee Act foregoes such categorization, a due process hearing is of utmost importance, especially in the case of sex offenders whose crimes are less severe; the harm to them, should inaccurate disclosure to the public occur, would be great indeed.

The purpose of the due process hearing is two-fold: to ensure that (1) the information to be disclosed is accurate; and (2) disclosure is in fact necessary to protect the public (as required by Tenn.Code Ann. §§ 40–39–106(c) and (d)). *See Cutshall*, 980 F.Supp. at 934. To make that latter determination, the presiding judge will need to assess the danger to the community posed by the sex offender. I would place the initial burden of demonstrating compliance with this two-prong test on the prosecution, and afford the sex offender an opportunity to rebut those findings, particularly the "risk of danger to the community" assessment. In cases where the need to protect the public is great, and where notice to the public must quickly occur, this hearing could perhaps be expedited. In all cases, however, both the prosecution and the sex offender should be afforded an opportunity to present relevant evidence including, when necessary, testimony by expert witnesses. *See id.*

I also voice my objection to the majority's expansive view of its role in this case.

The majority notes at the outset that it was "asked to decide whether the Act violates the United States Constitution, specifically, the Double Jeopardy, *Ex Post Facto*, Bill of Attainder, Due Process, or Equal Protection Clauses; the Eighth Amendment; the constitutional right to travel interstate; and the constitutional right to privacy." *Ante*, at 469. The district court, however, limited its discussion to just one issue: whether the Tennessee Act violates Cutshall's procedural due process rights. *See Cutshall*, 980 F.Supp. at 931. The district court concluded that "[b]ecause ... the discretionary disclosure provisions of the Tennessee [Act] ... violate[ ] the Due Process Clause of the Fourteenth Amendment ..., [we] do[ ] not reach the merits of the other constitutional challenges to the Act." *Id.* at 934. Recognizing that we are a reviewing court, and that our role is to review decisions rendered by the district courts, not make those decisions in the first instance, *see Roeder v. American Postal Workers Union, AFL–CIO*, 180 F.3d 733, 737 n. 4 (6th Cir.1999) (citing *United States v. Markwood*, 48 F.3d 969, 974 (6th Cir.1995)), I would limit the majority's discussion to a review of the district court's Fourteenth Amendment analysis, and remand this case for supplemental constitutional findings.