# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs March 3, 2015

## STATE OF TENNESSEE v. JAMES HARRELL DRIVER

**Appeal from the Circuit Court for Madison County**
**No. 14-7      Roy B. Morgan, Jr., Judge**

---

**No. W2014-01152-CCA-R3-CD  - Filed May 27, 2015**

---

A Madison County jury convicted the Defendant, James Harrell Driver, of violating the Sexual Offender Registry residency restriction.  The trial court sentenced the Defendant, as a Range II offender, to four-years' incarceration.  On appeal, the Defendant asserts that: (1) the evidence is insufficient to support his conviction; (2) the trial court improperly imposed a four-year sentence; and (3) Tennessee Code Annotated section 40-39-211(c) is unconstitutional as applied in this case.  After a thorough review of the record and applicable law, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which ROBERT H. MONTGOMERY JR. and TIMOTHY L. EASTER, JJ., joined.

George Morton Googe, District Public Defender, and Jeremy B. Epperson, Assistant Public Defender, Jackson, Tennessee, for the appellant, James Harrell Driver.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Jerry Woodall, District Attorney General; and Rolf G.S. Hazlehurst, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Background and Facts

The Defendant impregnated his wife's younger sister, C.E.,[1] when she was between fifteen and seventeen years old, and C.E. gave birth to a boy in December 2000. The Defendant was convicted of statutory rape of C.E. in 2002 and placed on the Sex Offender Registry. After his release from prison, the Defendant renewed his relationship with C.E. in an effort to have a relationship with his son. At this time, C.E. also had a minor daughter ("minor child") living with her from a relationship with another man. On August 24, 2013, a Madison County Sheriff's Office deputy found the Defendant residing at C.E.'s residence where C.E.'s then five-year-old daughter also resided, in violation of the Sex Offender Registry requirement that the Defendant not live with a minor that is not his legal child. A Madison County grand jury indicted the Defendant for violation of the Sexual Offender Registry residency restriction.

At a trial on this charge, the parties presented the following evidence: Mark Headen, a Jackson Police Department investigator, testified that he oversaw all sex offenders on the Sex Offender Registry. He confirmed that the Defendant was one of the persons that he supervised in this capacity. Investigator Headen identified the 2002 judgment of conviction of the Defendant for statutory rape. He stated that he had been supervising the Defendant since 2011. He also identified the Tennessee Bureau of Investigation ("TBI") requirement form for persons on the Sex Offender Registry signed by the Defendant and dated July 2, 2013.

Investigator Headen explained that the Defendant had "been on the registry for quite some time" but, during the last review of the TBI requirement form, Investigator Headen asked the Defendant if there were any requirements he did not understand. The Defendant responded, "No, sir. Are there any new changes?" Investigator Headen informed the Defendant that there were no new changes, and the Defendant signed the requirement form. Investigator Headen confirmed that he had reviewed the requirements with the Defendant "numerous times" over the course of his supervision of the Defendant, and the Defendant had attended a class in October 2011 where Investigator Headen reviewed the requirements with attendees "more specifically." Investigator Headen stated that, based upon his experience with the Defendant, he believed the Defendant understood what was required of him in relation to the Sex Offender Registry.

Investigator Headen read aloud the requirement that "no sex offender or violent sex offender whose victim was a minor shall knowingly reside with" a minor unless the offender is the legal parent of the minor. Investigator Headen confirmed that the Defendant listed an

---

[1] Because C.E. was the victim of statutory rape in the case that resulted in the Defendant being placed on the Sexual Offender Registry, we will refer to her and her family members by their initials for privacy reasons.

address located on Highway 70 East address as his secondary residence as recently as August 28, 2013. He explained that the TBI defined a secondary residence as, "some place that you may stay 15 times a year, some place that you do not permanently reside but have an occasion to visit."

On cross-examination, Investigator Headen explained that the Defendant told him that he wanted to list the Highway 70 address as a secondary residence in order to help out an ill family member. Investigator Headen stated that he was aware that C.E. resided at this address but that the Defendant's son also lived there. He understood that the Defendant's presence at the residence was to assist in caring for his son. On redirect examination, Investigator Headen stated that he was unaware that a second child not related to the Defendant also lived at the Highway 70 residence. He confirmed that the Defendant and C.E. were not married.

Shane Paar, a Madison County Sheriff's office deputy, testified that in August 2013 he was dispatched to an address on Highway 70 to conduct a welfare check. Deputy Paar explained that the nature of the welfare check was to confirm that a minor child was not living at the residence with an offender in violation of the Sex Offender Registry. When Deputy Paar arrived at the address, he observed toys in the yard and a black pickup truck in the driveway. Deputy Paar "ran the registration of the truck" and confirmed the Defendant's ownership of the truck. Deputy Paar made contact with a white female at the front door who advised that the Defendant was "on his way home." Deputy Paar explained the purpose of his visit, and the female invited him inside the residence. He described the residence as "poor living conditions for any type of child." He recalled that the female identified herself as the Defendant's wife and, by all indications of her statements, the Defendant was a resident at this address.

Deputy Paar observed two pairs of mens jeans inside one of the bedrooms. He also found the minor child in the "parent's bedroom," and the Defendant's son in his own bedroom at the rear of the trailer. The minor child was in a "makeshift bed" at the foot of the bed in the "parents' bedroom." Deputy Paar stated that he made contact with the Defendant by telephone, and the Defendant stated that he was on his way "home." Deputy Paar explained that he was conducting a welfare check and asked to speak with the Defendant in person. The Defendant arrived, on foot, shortly after the telephone call.

Deputy Paar testified that he asked the Defendant how many times a week he stayed at the trailer and about his relationship to each of the people residing there. The Defendant told Deputy Paar that the minor child was his daughter. Deputy Paar then informed the Defendant that he had already identified the minor child's father, who was out of the country at that time. The Defendant admitted to Deputy Paar that he did reside overnight at the

-3-

residence "from time to time" while the minor child was present. Deputy Paar arrested the Defendant and transported him to the criminal justice complex where the Defendant gave a statement.

Deputy Paar read the Defendant's statement aloud, as follows:

I, [the Defendant], do use [the Highway 70 residence], as a secondary address. The reason for this being my secondary address is my 12-year-old son lives there. Also living there is [P.E.], my son's grandmother, [C.E.], [my son's] mother, and [the minor child], [my son's] younger sister. . . . I stay at [the Highway 70 residence] from Friday 'til Monday when [my son's grandmother] has to work, and sometimes either Thursday or Tuesday I help [my son's grandmother, P.E.,] by making sure [my son] gets up for school and takes his medicines in the morning, afternoon and at night. I do help with chores when I'm there. I am present while [the minor child] is there but never alone with her. [C.E.] watches [the minor child], even if we all are outside playing. I have been at [the Highway 70 residence] this week for the fact that [my son] was released from the hospital Saturday, 8/17, from being hospitalized with staph infection in the bend of his right arm. When I stay at [the Highway 70 residence] I sleep on the couch in the living room. [My son] sleeps in the back room along with his grandmother when she's off work. [The minor child] sleeps in the front bedroom with [C.E.], her mother. I was told by [C.E.] that she had called the District Attorney, Jody Pickens, and talked to him about me being around her and staying at the [Highway 70 residence]. I was told by [C.E.] that Jody Pickens told her if she was okay with me being around her and staying at the [Highway 70 residence], then he was okay with it as well. I have called Jody Pickens and he returned my call. I spoke with him about me being around [C.E.] because she and I were wanting to date each other. She wants me to be a part of my 12-year-old son's life. Jody Pickens informed me that he did not feel comfortable talking to me seeing that he and I are on different sides of the law. Jody did tell me that he would talk to [C.E.] if she called him.

I have spoken with Investigator Mark Headen, and he is aware that I do and have stayed at [the Highway 70 residence], with my son . . . . Investigator Headen is aware that [C.E.] and I are also dating and want to be a family for our son . . . . I have left messages for Investigator Headen I would be staying at [the Highway 70 residence], while I would be staying there. I have also left a message for Investigator Headen that my 12-year-old son . . . was hospitalized Thursday, 8/15, at 4:30 a.m. at Regional Hospital with staph

-4-

infection in his right arm. [My son] was released Saturday, 8/17, and I have been staying with [my son].

The statement was signed and dated August 24, 2013. Deputy Paar identified the minor child's birth certificate listing C.E. as the mother and no listing for a father.

C.E. testified on the Defendant's behalf that she and the Defendant have a twelve-year-old son together. Their son was thirteen at the time of trial and would turn fourteen on December 21. C.E. confirmed that she was the victim of statutory rape and that the Defendant was convicted as a result. C.E. stated that she had remained in contact with the Defendant concerning their son since the Defendant's conviction. C.E. recalled that in August 2013, her son contracted a staph infection and was hospitalized. Upon his release from the hospital, the Defendant came to her residence to help her with the administration of their son's medication. She explained, "[The Defendant] was not living with us. He was staying there helping us with [my son] because [my son] was on 800 milligram[s] of antibiotics and we had to give them every eight hours, and once I fall asleep, I do not hear nothing and I will not wake up unless it's in my ear." She maintained that the only times that the Defendant was at her residence were when she had contacted him concerning their son.

C.E. testified that she called Investigator Headen "about it," and Investigator Headen said "he didn't have no problem with it" as long as the Defendant left before the minor child "went to bed." C.E. stated that the Defendant always left before the minor child went to bed. C.E. explained that her father had died two years before and that she had sought to involve the Defendant in their son's life as a "male figure." C.E. then stated, contrary to her prior testimony, that she never spoke with Investigator Headen "about all this" but that her mother spoke with Investigator Headen. C.E. stated that when Deputy Paar conducted the welfare check, none of the Defendant's belongings were in the residence. C.E. stated that both of the jeans that Deputy Paar saw in the residence were her jeans.

C.E. testified that she did not tell Deputy Paar that she and the Defendant were married. She said that she told the deputy that the Defendant was "not" her husband but her boyfriend at the time. She suggested that Deputy Paar may have misunderstood her because it was "like 1:00 a.m." when he arrived at her residence. She stated that she told Deputy Paar that the Defendant was the minor child's uncle and that the Defendant was at his home on the night of the welfare check. She explained to Deputy Paar that the Defendant was walking over to give their son medication because she did not wake their son up from a "dead sleep" because he would be irritable.

On cross-examination, C.E. testified that she met the Defendant and became pregnant with their son while he was dating her older sister. She agreed that she originally denied that

the Defendant was the father of their son, and the Defendant denied paternity as well. She later told authorities that the Defendant forced himself on her and then stated that was not true. C.E. said that when the Defendant found out she was pregnant he stated, "If you say anything to anybody, I'll hurt you and the baby." C.E. agreed that the Defendant went with her to take the minor child to school one time before their son was hospitalized for the staph infection. She then recalled that the Defendant also went to school with her regarding their son and spoke with the school principal.

C.E. testified that the only time the Defendant had stayed at her residence was after their son's hospitalization to assist with the medications. She then recalled that the Defendant had stayed at her residence on another occasion when the minor child and their son were both "real bad sick." She then stated that she did not have a good memory of when the Defendant had stayed at her residence. She maintained that she told Deputy Paar that the Defendant did not live at her residence but was only there briefly to administer medication to their son. She then agreed that she had told Deputy Paar that the Defendant slept in the residence while the minor child was present but only when other adults were present. Contrary to her testimony on direct, she denied that Investigator Headen told her mother that the Defendant had to leave the residence before the minor child went to bed. She admitted that she and the Defendant had planned to marry, but she "told him no."

P.E., C.E.'s mother, testified that the Defendant was her son-in-law and that she had legal custody of her grandson, who was C.E.'s and the Defendant's son. She stated that she lived in the trailer on Highway 70 in August 2013 with her daughter and grandchildren. She said that the Defendant did not live at this residence but that he would come over to work on his truck that had broken down. P.E. recalled that one night in August 2013, she went to bed while C.E., the Defendant, and their son stayed up and played cards. At some point her grandson woke her up and told her that his arm was burning. P.E. instructed C.E. and the Defendant to take their son to the hospital while she remained with the minor child, who was asleep. She said that her grandson was admitted to the hospital, and, when he returned home, he needed 800 milligrams of antibiotic every eight hours. She asked the Defendant to come over to administer the medication because C.E. "could not get up to give" the medication. She said that the Defendant did not spend the night, he only came and gave the medication and then left.

P.E. testified that she called Investigator Headen and that Investigator Headen told her that the Defendant could have contact with his son. She stated that she told Investigator Headen about the minor child in the residence, and Investigator Headen said that the Defendant could help with the medication as long as he left the house before the minor child went to bed. P.E. stated that she did not "have any problem" with the Defendant coming over to the residence as long as he did not mistreat or be rude to his son. She believed it was good

for her grandson to have a male in his life.

On cross-examination, P.E. explained that she left the residence to go to work at 11:00 or 11:30 p.m. four nights a week and ended her work shift at 9:00 or 10:00 a.m. the following morning. She maintained, however, that the Defendant did not spend the night at the Highway 70 residence. She agreed that, on the nights she was at work, she would not know whether the Defendant was at Highway 70 residence or not. P.E. explained that she referred to the Defendant as her son-in-law because he used to be married to her other daughter. She agreed that C.E. became pregnant by the Defendant while the Defendant was married to her other daughter.

The Defendant's son testified that the Defendant lived at East Forest while he, his mother, his sister, and his grandmother lived in the trailer on Highway 70. He maintained that the Defendant never stayed at the Highway 70 residence but that the Defendant would come and visit him after his hospitalization for the staph infection.

The Defendant testified that he had lived at an address on East Forest Avenue since August of 2009. The Defendant stated that he listed the Highway 70 address as a secondary residence after his son's grandfather passed away. He stated that he asked Investigator Headen if he could go to this residence to see his son. Investigator Headen responded that if the Defendant might be visiting with his son on occasion, it would be wise for the Defendant to list the Highway 70 address as a secondary residence. He said that he spent time at the Highway 70 residence while C.E. and the minor child were in Mexico, but he never spent the night. He explained that he would go there during the day to see his son and stay until late at night but would always return to his home.

The Defendant recalled the night of his arrest for this charge. He stated that he was asleep at his home on East Forest Avenue when he awoke and realized he needed something from his truck. He was headed to the Highway 70 residence when C.E. called and told him that police officers were there with a warrant. When the Defendant arrived, he knocked on the door and a deputy invited him inside. The Defendant entered, believing that because the officers were present he would not be in trouble for being in the residence with the minor child.

The Defendant testified that he would go to the Highway 70 residence in the morning to wake up his son for school. He recalled one other occasion when he was at the residence playing cards with C.E. and his son, which was the same night his son was admitted to the hospital for three or four days due to a staph infection. When his son was released from the hospital, he assisted in administering medication but maintained that he did not sleep overnight at the Highway 70 residence.

On cross-examination, the Defendant testified that Investigator Headen never told him it was okay for him to stay at the Highway 70 residence while the minor child was present. He said that he did discuss the minor child with Investigator Headen on "numerous occasions." The State read from his statement to police where he indicated that he stayed at the Highway 70 residence Friday to Monday when P.E. was at work and then asked the Defendant again if he stayed overnight at the Highway 70 residence. The Defendant responded that he did stay there after his son was released from the hospital. The Defendant agreed that he admitted in his police statement that he slept on the couch. He added that he sometimes would sleep in his truck outside when he "couldn't get nobody to take me over there."

The Defendant agreed that he admitted in his statement to police that he stayed at the Highway 70 residence but clarified that he only went to there during the daytime and at night until the minor child went to sleep. He stated, "I did not go over there and spend the night." He then clarified that the only time he spent the night was after his son was released from the hospital, and P.E. needed him to wake his son up for school. It was on these occasions that he would sleep on the couch.

The State then recalled Deputy Paar, who confirmed that C.E. indicated to him that the Defendant resided at Highway 70 residence. He recalled asking her if the Defendant was there, to which she replied, "He has not made it home yet, but he is on his way home." Deputy Paar confirmed that the Defendant told him that his primary address was on East Forest but that he did stay overnight at the Highway 70 residence while the minor child was present. Based upon his conversation with the Defendant, Deputy Paar stated that he believed the Defendant "pretty much c[a]me and went as he please[d] whether the minor child was present or not."

Jody Pickens, an Assistant District Attorney, testified that he was involved in the 2002 prosecution of the Defendant for statutory rape. Mr. Pickens testified that C.E. contacted him inquiring about the Defendant residing with her. Mr. Pickens declined to advise her on the Defendant's legal requirements. The Defendant then called Mr. Pickens who advised the Defendant that he was not comfortable providing the Defendant with legal advice as a prosecutor. He suggested that any questions the Defendant may have about his requirements should be addressed to a criminal defense lawyer. Mr. Pickens denied ever telling either C.E. or the Defendant that it was "okay" for the Defendant to stay at the Highway 70 residence.

Based on this evidence, the jury convicted the Defendant of a violation of the sexual offender registry residency restriction. The trial court sentenced the Defendant as a Range II offender to serve four-years' incarceration. It is from this judgment that the Defendant

now appeals.

## II. Analysis

The Defendant asserts that: (1) the evidence is insufficient to support his conviction; (2) the trial court improperly imposed a four-year sentence; and (3) Tennessee Code Annotated section 40-39-211(c) is unconstitutional as applied in this case.

## A. Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his conviction. He asserts that the only witness contending that the Defendant resided at the Highway 70 residence was Deputy Paar. The Defendant also contends that he only visited his son "at the direction" of P.E. and his son. The State responds that there is sufficient evidence upon which a jury could find the Defendant guilty beyond a reasonable doubt of violating the sexual offender registry residency restriction. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286

S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978), *superseded by statute on other grounds as stated in State v. Barone*, 852 S.W.2d 216, 218 (Tenn. 1993)) (quotations omitted). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

As charged in this case, it is a crime for a sex offender whose victim was a minor to knowingly reside with a minor, unless the offender is the minor's parent. T.C.A. § 40-39-211(c), (e) (2012). The sex offender statutes define a secondary residence to include any place where a person "abides, lodges, resides or establishes any other living accommodations in this state for a period of fourteen (14) or more days in the aggregate during any calendar year . . . [or] for a period of four (4) or more consecutive or nonconsecutive days in any month." T.C.A. § 40-39-202(18). The residency restriction may be violated by establishing a primary or secondary residence with a minor, or by simply residing where a minor resides. *See* 7 T.P.I - Crim 10.17(b).

The evidence, considered in the light most favorable to the State, showed that the Defendant listed the Highway 70 address as a secondary residence on his registry forms. C.E. told police that the Defendant was her husband and would be "home" soon. The Defendant admitted in a statement that he stayed at the residence, and Deputy Paar observed

men's clothing in the residence and the Defendant's truck parked in the driveway. The evidence shows that the Defendant was present at the residence beyond a mere request for assistance from P.E. C.E. agreed that she and the Defendant had plans to marry, and she told Deputy Parr that they were married. Furthermore, the Defendant testified to being at the residence at night playing cards with his son and C.E. and referenced the residence as "home" to Deputy Parr. The Defendant also indicated in his statement the days he stayed at the residence every week while P.E. was at work.

We acknowledge that the Defendant offered testimony at trial that the Defendant did not stay at the residence. We reiterate, however, that the trier of fact resolves questions concerning the credibility of witnesses, the weight and value of the evidence, and all factual issues raised by the evidence; an appellate court should not re-weigh or re-evaluate the evidence. *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003); *Bland*, 958 S.W.2d at 659. Furthermore, a verdict of guilt by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in favor of the prosecution's theory of the case. *Bland*, 958 S.W.2d at 659. In this case, by its verdict, the jury accredited the State's witnesses' testimony and resolved any inconsistencies in favor of the State's theory that the Defendant committed the offense for which he was convicted.

Accordingly, we conclude that the proof is sufficient to support the Defendant's conviction beyond a reasonable doubt. The Defendant is not entitled to relief.

## B. Sentence

The Defendant argues his sentence is improper because the trial court failed to properly apply mitigating factors and because the State did not file a notice of enhancement. The State responds that the Defendant has failed to show that the trial court abused its discretion when sentencing the Defendant and that a notice of enhancement was filed in this case. We agree with the State.

The Tennessee Criminal Sentencing Reform Act of 1989 and its amendments describe the process for determining the appropriate length and manner of service of a defendant's sentence. Under the Act, a trial court may impose a sentence within the applicable range as long as the imposed sentence is consistent with the Act's purposes and principles. T.C.A. § 40-35-210(c)(2), (d) (2010); *see State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008).

In *State v. Bise*, the Tennessee Supreme Court announced that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" 380 S.W.3d 682, 708 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning

was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)). To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001); *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980). The reviewing court should uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise,* 380 S.W.3d at 709-10. In other words, so long as the trial court sentences a defendant within the appropriate range and properly applies the purposes and principles of the Sentencing Act, its decision will be granted a presumption of reasonableness. *Id.* at 707.

Although the trial court should consider enhancement and mitigating factors, these statutory factors are advisory only. *See* T.C.A. § 40-35-210(c) (2014); *see also Bise*, 380 S.W.3d at 704 n.33; *Carter*, 254 S.W.3d at 343. We note that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." *Carter*, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" *Id*. at 343. A trial court's "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W.3d at 706. "[Appellate Courts are] bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." *Carter*, 254 S.W.3d at 346.

The Defendant was convicted as a Range II, multiple offender, of a violation of the Sexual Offender Registry residency restriction, a class E felony. The sentencing range for this offense is two to four years. T.C.A. § 40-35-112(b)(5) (2013).

On January 8, 2014, the State filed a notice that it intended to seek enhanced punishment pursuant to Tennessee Code Annotated section 40-35-202, relying on the Defendant's previous criminal history. The Defendant filed a Notice of Mitigating Factors on March 21, 2014, in which he contended that the following mitigating factors applied: factor (1), that his conduct neither caused nor threatened serious bodily injury, factor (3), substantial grounds existed tending to excuse or justify his criminal conduct though failing to establish a defense, and factor (11), the offense was committed under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the conduct. T.C.A. § 40-35-113 (1),(3),(11).

The trial court held a sentencing hearing on April 28, 2014, and the parties agreed that the Defendant was a Range II offender subject to a sentencing range of two to four years. The State submitted the presentence report, noting the Defendant's criminal history, and the Defendant, relying on the submitted mitigating factors, asked that the trial court order the minimum sentence, suspended except for ninety days. After considering the evidence presented at trial and the sentencing hearing, the presentence report, the principles guiding sentencing, arguments of counsel, the nature of the conduct involved, and enhancement and mitigating factors, the trial court sentenced the Defendant to four years' incarceration. In so doing, it rejected application of any mitigating factors.

We first note that included in the record is the State's notice of enhancement which was filed well before the sentencing hearing in this case. With regard to the Defendant's argument that the trial court improperly failed to apply mitigating factors, we conclude that the evidence supports the trial court's determinations. The trial court followed the statutory sentencing procedure, made factual findings supported by the record, and considered the principles relevant to sentencing.

The trial court also stated that it had considered the trial evidence in reaching its sentencing determination. This evidence included the Defendant's criminal history involving seven prior convictions, one of which was for the statutory rape of C.E. After being released from prison, the Defendant resumed communication and contact with the victim of his sexual crime involving a minor. His relationship with the victim involved his continued presence at the victim's home while the victim's minor child was in the residence. The Defendant signed documentation indicating that he understood that he was not to reside in a residence where there was a minor child that was not his legal child. The Defendant disregarded these requirements and stayed at the Highway 70 residence. This evidences supports the trial court's sentence.

Furthermore, because the application of enhancement and mitigating factors in sentencing was rendered advisory by the 2005 amendments, we reiterate that the trial court may set a sentence anywhere within the applicable range so long as the sentence is consistent with the principles and purposes of the Act, regardless of the presence or absence of mitigating and enhancement factors. The trial court in this case thoroughly considered the purposes and principles of the Sentencing Act in rendering its decision; therefore, the imposition of the maximum sentence in the range is affirmed. The Defendant is not entitled to relief as to this issue.

### C. Sex Offender Registry Requirements

The Defendant's final issue is the constitutionality of Tennessee Code Annotated

section 40-39-211(c). He asserts that because he would not have been in violation of the statute had he married C.E. and been a "step-parent" of the minor child, the statute infringes on his fundamental "liberty interests, rights to privacy, rights to parenting and rights to marry." The State responds that this Court has previously upheld the constitutionality of the Tennessee Sex Offender Registry.

A defendant's obligations as a convicted sexual offender are listed in Tennessee Code Annotated sections 40-39-201 to -215, otherwise known as the "Tennessee Sexual Offender and Violent Sexual Offender Registration, Verification and Tracking Act of 2004" ("The Act"). The Act is a comprehensive statute requiring persons convicted of a sexual offense or violent sexual offense to provide to law enforcement officials certain regularly updated information, including the offender's residence, employment, electronic mail or other internet identification, and other personal information. T.C.A. § 40-39-203; *see also State v. Ward*, 315 S.W.3d 461, 468 (Tenn. 2010). Tennessee's Sexual Offender Registration Act was first adopted in 1994 and has since been amended multiple times.

Tennessee Code Annotated section 40-39-211 imposes certain other residential and work requirements on sexual offenders, providing in part as follows:

> While mandated to comply with the requirements of this part, no sexual offender, as defined in § 40-39-202, or violent sexual offender, as defined in § 40-39-202, whose victim was a minor, shall knowingly reside with a minor. Notwithstanding this subsection (c), the offender may reside with a minor if the offender is the parent of the minor.

The State correctly notes that the United States Supreme Court and the United States Court of Appeals for the Sixth Circuit have upheld the Tennessee's sex offender registry in *Smith v. Doe*, 538 U.S. 84 (2003), *Conn. Dept. of Public Safety v. Doe*, 538 U.S. 1 (2003), *Doe v. Bredesen*, No. 3:04-CV-566, 2006 WL 849849 (E.D. Tenn. Mar. 28, 2006), *aff'd* 507 F.3d 998 (6th Cir.2007), and *Cutshall v. Sundquist*, 193 F.3d 466 (6th Cir. 1999).

Our review does not support a conclusion that the Tennessee Sexual Offender Registration Act "compel[s]" the Defendant to marry C.E. as the Defendant argues. The General Assembly has clearly indicated an intent that this Act serve as a remedial and regulatory measure and subsequent appellate review of the Act has confirmed its constitutionality. *See Ward*, 315 S.W.3d 469; *see also*, *Smith*, 538 U.S. 84, *Conn. Dept. of Public Safety*, 538 U.S. 1, *Bredesen*, No. 3:04-CV-566, 2006 WL 849849, and *Cutshall*, 193 F.3d 466. The Defendant cites to *Davis v. Davis*, 842 S.W.2d 588 (Tenn. 1992) in support of his contention; however, this case has no application in this context. The Defendant is not

entitled to relief.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the trial court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE